# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

CLIFFORD W. MILLER,

    Plaintiff

v.

ROMEO ARANAS, et. al.,

    Defendants

Case No.: 3:17-cv-00068-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 76

    This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

    Before the court is Plaintiff Clifford Miller's Second Motion for Partial Summary Judgment. (ECF Nos. 76, 76-1 to 76-6.) Defendants Nevada Department of Corrections (NDOC) and Dr. Romeo Aranas filed a response. (ECF Nos. 93, 93-1 to 93-12, and authenticating declarations at ECF Nos. 94-1 to 94-4.) Plaintiff filed a reply. (ECF No. 96, 96-1 to 96-5.)[1]

    After a thorough review, it is recommended that the motion be denied.

---

[1] Plaintiff filed another motion for partial summary judgment addressing only Plaintiff's retaliation claim under the Americans with Disabilities Act against NDOC. (ECF No. 75) The court is addressing that motion in a separate report and recommendation. Plaintiff filed a single reply brief in support of both motions for partial summary judgment, stating that Defendants responded to both motions in one response; however, the record reflects that Defendants filed separate responses to the motions: ECF Nos. 92 and 93.

# I. BACKGROUND

Plaintiff is an inmate in the custody of the NDOC and is proceeding with this action pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act (ADA). (Third Amended Complaint (TAC), ECF No. 71.) Plaintiff was pro se when he filed his original complaint, but subsequently secured counsel, Terri Keyser-Cooper, Esq. (ECF No. 26.)

In the TAC, Plaintiff sues NDOC's former Medical Director Dr. Romeo Aranas pursuant to section 1983 for deliberate indifference to his serious medical needs in violation of the Eighth Amendment. He also sues NDOC for violation of Title II of the ADA and for retaliation under Title II of the ADA. (ECF No. 71.)

Plaintiff alleges that in a domestic tragedy in 1999, he shot himself in the head in an attempt to commit suicide, and was in a coma for two weeks and suffered serious injuries including near blindness in both eyes. He awoke one morning in October/November 1999, and his vision had returned in his left eye, but not in his right eye. Plaintiff was subsequently placed in the Humboldt County Jail, and in the summer of 2001 he saw an eye surgeon, who informed Plaintiff that in order to correct his vision he required cataract and realignment surgery. Plaintiff was subsequently transferred to NDOC, and has requested eye examinations and surgery since his incarceration in NDOC began in 2001. Plaintiff alleges that there were consultations and recommendations for surgery, but NDOC denied and delayed his requests because of its policies that one good eye is enough, cataract surgery is cosmetic, and non-life threatening surgeries are unnecessary. Plaintiff contends that during this time he was denied care for his serious medical condition, his eyesight in his right eye deteriorated.

Plaintiff claims that in denying his requests for treatment and surgery pursuant to NDOC's policies, Dr. Aranas was deliberately indifferent to his serious medical need. In

addition, he contends that he is a qualified individual with a disability under the ADA because he is blind in one eye and never learned to compensate for his vision loss. He alleges that he was discriminated against based on his disability because NDOC failed to accommodate his request for a modification of its policies to allow him see a recommended specialist nearly 20 years after surgery had been recommended and denied based on NDOC policies.

The ADA retaliation claim, which Plaintiff addresses in a separate motion for partial summary judgment (ECF No. 75), alleges that Plaintiff was retaliated against when he was disciplined for filing a grievance to exhaust his administrative remedies for the ADA claim, as he was required to do under the Prison Litigation Reform Act (PLRA).

After Plaintiff had requested eye surgery over a nearly twenty-year period, and was denied surgery, NDOC agreed to have the surgery performed several years after Plaintiff initiated this litigation, in June of 2020. Unfortunately, the surgery was not successful in restoring his vision in his right eye. (ECF No. 76 at 3 n. 2; ECF No. 92-7 at 7.)

In this motion, Plaintiff seeks summary judgment with respect to liability on his Eighth Amendment claim under section 1983 against Dr. Aranas, as well as his Title II ADA claim against NDOC. If granted, Plaintiff asks to proceed to trial solely on the issue of damages. (ECF No. 76.)[2]

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*

---

[2] Since Plaintiff received the requested surgery, he is no longer seeking injunctive relief with respect to these claims.
(ECF No. 76 at 4:22.)

*v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went

uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

# III. DISCUSSION

**A. Facts**

The following facts are undisputed, unless otherwise noted:

On May 10, 1999, in connection with a domestic tragedy, Plaintiff shot himself in the head in an attempt to commit suicide. He was in a coma for two weeks, and when he awoke he could not see. Several months later, he regained sight in his left eye, but not the right eye. (Pl. Decl., ECF No. 76-4 at 10 ¶ 2.)

Plaintiff was a pretrial detainee in Humboldt County, and in 2000 he filed a motion for relief, requesting that the county pay for surgery on his eyes. He was examined by a Dr. Friedlander, an ophthalmologist and vitreoretinal surgeon. (*Id.*) Dr. Friedlander testified that Plaintiff had a cataract in his right eye, and recommended cataract extraction. When asked if the cataract surgery "needs to be done now," Dr. Friedlander's response was: "Only if Mr. Miller wants to see better." (ECF No. 76-7 at 9.) Plaintiff did not receive the surgery while detained in Humboldt County.

Plaintiff was transferred to the custody of NDOC in 2001, and on November 7, 2001, it was noted that he had a traumatic cataract to his right eye. (ECF No. 76-4 at 20; Pl. Decl., ECF No. 76-4 at 11 ¶ 4.)

On March 11, 2002, Plaintiff sent an inmate request form ("kite") stating he had lost sight in his right eye. Previously, he could see shapes and had some peripheral vision, but at this point all he could see was light. He indicated he had a cataract and blood in his right eye and was concerned. He was told an appointment was scheduled that day. (ECF No. 76-5 at 2.) Plaintiff was seen that day, and reiterated that he could previously see shapes and peripheral vision but now he could only sense light and dark out of the right eye, and felt pressure. The provider noted

he had decreased vision in the damaged right eye. There is a notation in the record stating: "probably nothing can be done." (ECF No. 76-5 at 22.)

Plaintiff sent a kite on April 2, 2002, asking to see the eye doctor as he needed surgery on the right eye for the blood and cataract, and to have the eye realigned. (ECF No. 76-5 at 4.)

In April 2002, Plaintiff was assaulted, and hit behind his right ear and on the right side of his face, and experienced reduced hearing and bruising. (ECF No. 76-4 at 22.) According to Plaintiff, he was moved to protective custody because he was too much of a medical risk being on the yard. He claims that he could not engage in sporting activities because he could not see the ball coming. He was hit by balls, bumped into walls and other prisoners as well as low hanging shelves. (Pl. Decl., ECF No. 76-4 at 11 ¶ 8.)

On May 6, 2002, he was seen and it was noted he had visual acuity of 20/50 in the left eye, and could not see out of the right eye at all as he had a cataract and blood in the eye. (ECF No. 76-4 at 22.)

On June 18, 2002, Plaintiff sent a kite asking if he had been scheduled for an eye doctor. He was told that he was "in the book" for an eye exam and that he needed to be patient. (ECF No. 76-5 at 6.)

On September 11, 2002, Plaintiff sent another kite asking to see the eye doctor for surgery on his eyes. (ECF No. 76-5 at 8.)

On October 4, 2002, an unknown provider wrote that Plaintiff could not see through his right lens and needed cataract surgery. He had correctible vision in the left eye, but the right eye was completely opacified with a severe right lens cataract. The provider recommended a consult for cataract surgery. (ECF No. 76-5 at 10.) That doctor was likely Dr. John Scott at Lovelock Correctional Center (LCC), who then referred Plaintiff to an ophthalmologist, stating Plaintiff

had a completely opacified right lens secondary to a gunshot wound in 1999. He had only

perception to light in the right eye, and was a possible candidate for cataract surgery. While not

life threatening, Dr. Scott indicated that the condition significantly affected Plaintiff's quality of

life. On November 19, 2002, this referral was disapproved by the Utilization Review Panel

(URP) without explanation. (ECF No. 76-5 at 12.)

Plaintiff states that he sent more kites regarding his eye in November of 2003. At that

point, he claims that he was constantly being hit by balls, bumped into other prisoners, and

walked into things because he had no peripheral vision in his right eye. Some prisoners would

take offense to him bumping into them and would become threatening. (Pl. Decl., ECF No. 76-4

at 12 ¶ 14.) Plaintiff also claims that he saw another doctor at LCC who told him he was a

candidate for cataract surgery and that the doctor would put Plaintiff in for approval but it would

take time. (Pl. Decl., ECF No. 76-4 at 13 ¶ 16.) Plaintiff has not produced any medical records

regarding this visit; however, other than stating that Plaintiff did not identify the doctor,

Defendants do not specifically contest whether this occurred.[3]

According to Plaintiff, he was transferred out of NDOC temporarily for several years for

his re-trial, which explains the absence of records during the 2004-2006 timeframe.

Plaintiff sent a kite on September 16, 2007, after returning to NDOC, stating he was told

at the end of June to send a kite about the status of his eye surgery and he never heard back. The

response was that the surgery had not been approved. (ECF No. 76-5 at 14.) Apparently, Plaintiff

---

[3] NDOC has control of Plaintiff's medical records, and it is unclear whether anyone conducted a search to determine whether or not there was a record of a visit with a provider in this timeframe that referenced Plaintiff's eye condition. Nor do Defendants assert any formal objection to Plaintiff's statement in his declaration.

1  had not previously been informed of the URP's November 2002 denial of Dr. Scott's

2  ophthalmology referral.

3        Plaintiff states that he saw another unidentified eye doctor in 2008 who again said his

4  right eye was treatable with surgery to remove the cataract and realign the eye. Plaintiff claims

5  that provider told him he would not receive the surgery because it would be deemed a cosmetic

6  procedure by the URP. The provider further advised Plaintiff that doctors were instructed not to

7  request cataract surgery unless vision in both eyes was significantly impaired. (Pl. Decl., ECF

8  No. 76-4 at 13 ¶ 17.) Plaintiff claims he also saw an unidentified caseworker about the "one good

9  eye" policy in 2008, and she also said she was aware of the policy that having one good eye

10  prevented surgery on the other eye. (*Id.* ¶ 18.) Again, Dr. Aranas raises the fact that Plaintiff did

11  not identify these individuals, but does not specifically contest that these events occurred or

12  assert any formal objection to the statement Plaintiff attributes to the caseworker.

13        Dr. Aranas was appointed medical director of NDOC in 2013. (ECF No. 76-3 at 15.)

14        On February 26, 2016, Plaintiff was seen by Dr. Seljestad, an optometrist. He assessed

15  Plaintiff with a traumatic cataract secondary to a gunshot wound to the eye. It is difficult to read

16  his notes, but there is a notation that the cataract was stable. (ECF No. 93-1 at 2.) According to

17  Plaintiff, Dr. Seljestad told Plaintiff that he believed Plaintiff had neurological damage to his eye

18  and he would never see out of the eye. (Pl. Decl., ECF No. 76-4 at 13-14 ¶ 19; ECF No. 93-2 at

19  4.)

20        On February 28, 2016, Plaintiff filed an informal level grievance, grievance number

21  2006-30-19027, asserting that there had been a refusal to treat his serious eye issues. He

22  indicated he had an issue with his right eye dating back to 1999, and he saw a doctor while he

23  was at the Humboldt County Jail who said he needed surgery to remove the cataract and realign

the eye. He entered NDOC in 2001, and claimed that an eye doctor told him he needed surgery and he would be put on the list. He left NDOC custody for retrial in 2004, and when he returned in 2006 he was told it was a cosmetic procedure and that the surgery would not be done. On February 26, 2016, Plaintiff saw an eye doctor (Dr. Seljestad) who told him he has neurological damage and would never see out of the eye again. He asked to see an outside specialist and receive treatment for his cataract. (ECF No. 93-2 at 2-4.)

Plaintiff received a response to the informal grievance on April 29, 2016, from a B. Borg (not a defendant) who said that he checked the chart and Plaintiff was seen on February 25, 2015, by the eye doctor at NNCC who is an outside consultant (Dr. Seljestad), and the doctor stated that the eye was stable. The grievance responder indicated that he asked their (NDOC's) doctor to review Plaintiff's chart, and a consultation has been ordered and Plaintiff would have to await approval. He also noted that this was an injury from 1999. (ECF No. 93-3 at 2.)

On May 25, 2016, Plaintiff filed a first level grievance, where he repeated the history of his eye issues. Once again, he asked to be seen by an outside specialist for cataract and realignment surgery. (ECF No. 75-2 at 6-9.)

On May 27, 2016, Plaintiff sent a kite stating he had seen Dr. Michael J. Fischer (an ophthalmologist), who advised Plaintiff he would need to see a different eye specialist and that he would be sending NDOC a letter explaining this. He asked when he would be sent to see the other specialist. In response, he was told that the URP had asked that Plaintiff be seen in the eye clinic at NNCC, and there was a long list for this clinic so Plaintiff needed to be patient. (ECF No. 76-5 at 16.)

On June 2, 2016, Dr. Fischer sent a letter to NDOC stating that he saw Plaintiff for an evaluation. He indicated that Plaintiff suffered a gunshot wound to the face in 1999, and since

that time had difficulty with his right eye being exotropic.[4] His visual acuity with corrections in the right eye was "count fingers," and it was 20/25 in the left eye. Dr. Fischer recommended strabismus surgery to correct the problem; however, this was not a surgery he performed, so he recommended Plaintiff see Dr. Hong in Reno. (ECF No. 76-6 at 15; ECF No. 93-6 at 2.)

On July 1, 2016, P. Smith responded to Plaintiff's first level grievance, stating Plaintiff's chart and his previous level grievances had been reviewed. The responder said that Plaintiff had been receiving care for his eye throughout the process: he had seen NDOC providers, and an eye consultation had been wait and they had to await the appointment to be approved and set. It was also noted that he had been seen by the ophthalmologist in May, who recommended another opinion, and this had to be approved by the URP and then the appointment had to be set up with the specialist at their availability. Next, the grievance responder said that Plaintiff had a self-inflicted gunshot injury to the eye from 1999 that did not qualify as urgent care or life threatening. (ECF No. 93-4 at 2.)

On July 22, 2016, Plaintiff sent a kite repeating that he had seen Dr. Fischer on May 26, 2016, who had recommended Plaintiff see another eye specialist. He asked when he would see the specialist. The response stated that the URP reviewed his case, and wanted Plaintiff seen by NDOC's "in house" eye doctor and he had been scheduled, and he was told again he needed to be patient. (ECF No. 76-5 at 18.)

Plaintiff subsequently submitted a second level grievance, which Dr. Aranas responded to on November 10, 2016. Dr. Aranas indicated he had reviewed Plaintiff's chart as well as his first and second level grievances where he claimed a refusal to treat and care for his eye condition.

---

[4] "Exotropia is a form of strabismus (eye misalignment) in which one or both of the eyes turn outward." *See https://aapos.org/glossary/exotropia,* last visited February 4, 2020.

Dr. Aranas then said that Plaintiff's grievance acknowledged multiple visits with providers and specialists. He went on to state that Plaintiff had a self-inflicted gunshot injury from 1999 which did not qualify as urgent care or life threatening. He advised Plaintiff that he had been receiving care for the eye throughout the grievance process and since the last grievance had seen another eye specialist. The provider reviewed the consult and report with no mention of surgery. Finally, Dr. Aranas advised Plaintiff he was ordered for a follow up with the eye clinic in one year. (ECF No. 93-5 at 2.)

Plaintiff filed his original complaint on February 2, 2017. (ECF No. 1-1.)

Ms. Keyser-Cooper appeared in this case on Plaintiff's behalf on August 27, 2019. (ECF No. 26.)

Just shy of three years after Dr. Aranas denied his second level grievance on grievance 2006-30-19027, and roughly a month after Plaintiff's counsel appeared in this action, Plaintiff saw Dr. Hong, the ophthalmologist that Dr. Fischer had recommended Plaintiff see back in May of 2016. Dr. Hong's notes say that Dr. Fischer represented that he was afraid to do realignment surgery without causing Plaintiff to have double visual acuity. Dr. Hong evaluated Plaintiff and recommended that he be referred to a general ophthalmologist for a cataract evaluation. (ECF No. 76-6 at 17-18; ECF No. 93-7 at 2-3.) A facsimile cover sheet dated October 28, 2019, from Dr. Hong to Ms. Keyser-Cooper has a notation: "Cataracts in both eyes, right worse than left. Not urgent; elective surgery." (ECF No. 93-8 at 2.)

Roughly six months later, Plaintiff saw Robert Wolff, M.D., at Sierra Nevada Eye Center. Dr. Wolff noted that Plaintiff had an injury in 1999 causing trauma to the right eye, and now had a traumatic cataract. His visual acuity had not been clear since, and seemed to be worsening. He experienced floaters, and felt the right eye flashed out when he goes from dark

rooms to light rooms or vice versa. Plaintiff was described as having blurry, decreased vision with a glare and halos for many years. His vision was cloudy, foggy and hazy, and he had difficulty reading and seeing the television. This condition was constant and was aggravated by bright lights. Dr. Wolff's impression was a total traumatic cataract of the right eye that was significantly affecting Plaintiff's vision and "ADL" (activities of daily living). Dr. Wolff indicated that it was unclear what damage there was to the right eye, but he would assume there was traumatic optic neuropathy given the gunshot wound history. The dense cataract did appear stable. Dr. Wolff discussed the cataract surgery option with Plaintiff, including that it was potentially a complicated surgery that may require additional surgery, there was unknown visual acuity potential, and potential diplopia that might require strabismus surgery. Plaintiff indicated he wanted to proceed with the surgery. (ECF No. 76-6 at 11-13.)

Dr. Wolff performed the cataract surgery on June 30, 2020. (ECF No. 93-9 at 7.) Unfortunately, it was not successful in restoring Plaintiff's vision. Plaintiff was seen by Robert Welch, FNP CRNO, after the surgery. There is a notation of a choroleoretinal scar and "other disorders of the optic nerve." Welch stated that the shape of the atrophy near the optic nerve is suggestive of a large choroidal rupture, which was also consistent with his history, and a contributing factor to his vision loss and guarded prognosis. It was described as likely to be traumatic optic neuropathy given his history. (ECF No. 93-9 at 2-3.)

Dr. Aranas admits he is not aware of any medical treatment to correct a cataract other than surgery. (ECF No. 76-2 at 14.) Dr. Aranas never personally met with Plaintiff or examined his eye. (ECF No. 76-3 at 6-7, response to interrogatory 11; ECF No. 76-2 at 9-10, response to request for admission 4.) Dr. Aranas is not an ophthalmologist. (ECF No. 76-2 at 9, response to request for admission 1.)

NDOC's Medical Directive 123 governs vision assistance. It provides that an inmate with a cataract that causes visual impairment incompatible with the ability to perform the required tasks of daily living in their current environment may be considered for removal of such cataract. It goes on to provide that there must be documentation of a best corrected visual acuity of less than 20/60 in both eyes with current (less than 6 months) refraction. All cataract extraction requests must be approved by the URP and medical director. (ECF No. 76-4 at 6.)

NDOC also has a regulation governing "elective cosmetic surgery." AR 618 states that a surgery not indicated for treatment or prevention of a serious medical problem will not be authorized. Such a request will be reviewed by the URP, and the medical director has final authority on such determination. (ECF No. 76-4 at 8.)

**B. Eighth Amendment vs Dr. Aranas**

**1. Standard**

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051,

1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted). "'[A] prisoner need not prove that he was completely denied medical care' in order to prevail" on a claim of deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (quoting *Lopez*, 203 F.3d at 1132), *overruled on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Instead, to establish deliberate indifference in the context of a difference of opinion between a physician and the prisoner or between medical providers, the prisoner "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and

15

that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

"The provision of some medical treatment, even extensive treatment over a period of years, does not immunize officials from the Eighth Amendment's requirements." *Edmo v. Corizon* 935 F.3d 757, 793 (9th Cir. 2019) (citation omitted).

### 2. *Colwell v. Bannister*

Plaintiff relies extensively on *Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014) to support his argument that Dr. Aranas was deliberately indifferent to his serious medical need and he is entitled to summary judgment. This warrants a detailed discussion of the *Colwell* decision.

Colwell, like Plaintiff, was blind in one eye due to a cataract (and had been so since roughly 2002) and his treating doctors recommended surgery to restore his vision. The surgery was denied by NDOC's medical supervisors (the URP) "because of NDOC's 'one eye policy'— cataract surgery is refused if an inmate can manage to function in prison with one eye." *Colwell*, 763 F.3d at 1063.

NDOC had a policy, then Medical Directive 106, which stated:

> 1. Patients with visual impairment incompatible with the ability to perform the required tasks of daily living in their current living environment may be considered for removal of a cataract.
>
> 2. All cataracts extraction requests must be approved by the [URP] and the Medical Director."

*Id*. at 1064.

Colwell's physician, an optometrist, as well as an ophthalmologist all opined that cataract surgery was indicated, and that while not life-threatening, his eye condition did "'significantly affect' his quality of life." *Id.* Colwell filed grievances and requested further evaluation. The grievances were denied and several physicians told him that the surgery would not be approved

because the prison had a "one eye only" policy, meaning that if the inmate could see out of his other eye, he would not qualify for cataract removal. *Id*. at 1064-65. He was also told in response to another grievance that NDOC's Administrative Regulation (AR) 618 defined his request for cataract surgery as a "cosmetic/elective" surgery, and since he had one eye corrected to 20/20 vision, the surgery for the second eye was in a "non-essential" category despite the prison optometrist's recommendation. *Id*. at 1065.

NDOC's medical director at the time, Dr. Robert Bannister, denied a second level grievance, stating that in most cases cataract surgery is not an emergency, and that Colwell should be "evaluated periodically to determine the degree of impairment caused by [his] cataract with regard to [his] ability to perform the activities required in [his] current living situation." *Id.*

Colwell filed suit under section 1983, asserting a claim for deliberate indifference to his serious medical need under the Eighth Amendment based on prison officials refusing to provide him surgery.

The Ninth Circuit confirmed that "blindness in one eye caused by a cataract is a serious medical condition." *Id*. at 1063, 1065. The court explained: "Although blindness in one eye is not life-threatening, it is no trifling matter either. … Monocular blindness is the loss of the function of an organ." *Id*. at 1066. The court concluded that Colwell had a serious medical need because not only was he blind in one eye, but "his monocular blindness caused him physical injury," citing examples, including that he ran into things, hit his head on the upper bunk, and bumped into other inmates which triggered fights on occasion. *Id*. at 1067.

Addressing the subjective component of the Eighth Amendment claim, the court found Colwell's was not a case of a difference of medical opinion, or of ordinary mistake or negligence. The court instead found that "the evidence [was] undisputed that Cowell was denied treatment

1    for his monocular blindness solely because of an administrative policy, even in the face of

2    medical recommendations to the contrary." *Id*. at 1068.

3         The court said: "A reasonable jury could find that Colwell was denied surgery, not

4    because it wasn't medically indicated, not because his condition was misdiagnosed, not because

5    the surgery wouldn't have helped him, but because the *policy* of the NDOC is to require an

6    inmate to endure reversible blindness in one eye if he can still see out of the other." *Id*. (emphasis

7    original). The court found this to be "the very definition of deliberate indifference." *Id*.

8         While this court had found that Plaintiff had not demonstrated that the decision to deny or

9    delay surgery caused him harm, in reversing and remanding the matter for trial, the Ninth Circuit

10   concluded that "as long as the eye remains untreated, Colwell continues to suffer blindness in his

11   right eye, which is harm in and of itself, along with all of the other harms and dangers that flow

12   from that." *Id*.

13        In *Colwell*, it was the defendants that had moved for summary judgment, and the Ninth

14   Circuit determined that there was sufficient evidence in the record to create a genuine dispute of

15   material fact regarding whether Colwell was harmed by the refusal to approve his surgery, so

16   that entering summary judgment in favor of the defense was error. *Id*.

17        The Ninth Circuit also rejected this court's finding that there was a difference of medical

18   opinion ,which requires a showing that the chosen course of treatment was medically

19   unacceptable under the circumstances and chosen in conscious disregard of an excessive risk to

20   the plaintiff's health. *Id*. The court explained that the record demonstrated that Colwell had been

21   seen by specialists who recommended cataract surgery after personally examining Colwell, but

22   NDOC's non-specialist, non-treating medical officials disregarded their recommendations. *Id*.

23

The Ninth Circuit further found that the reason for the denial  was "not because of conflicting medical opinions about the proper course of treatment, but because officials enforced the 'one eye only' policy." *Id*. The Ninth Circuit pointed out that the formal cataract policy, then Medical Directive 106, required a case-by-case determination of a request for cataract removal surgery which looked at the inmate's ability to function, but the evidence showed that in reality NDOC denied the request for surgery "as long as a prisoner has one 'good' eye" and Colwell had been told this on multiple occasions. *Id*.

The court concluded that "[a] reasonable jury could find that NDOC officials denied treatment because Colwell's medical need conflicted with a prison policy, not because non-treatment was a medically acceptable option." *Id*. at 1070.

Finally, the court held that "the blanket, categorical denial of medically indicated surgery solely on the basis of an administrative policy that 'one eye is good enough for prison inmates' is the paradigm of deliberate indifference." *Id*. at 1063.

Notably, Dr. Bannister argued on appeal (though he did not raise the argument in the district court) that he lacked personal participation in the asserted constitutional violation. *Id.* at 1070. The Ninth Circuit rejected this argument because Dr. Bannister had personally denied Colwell's second level grievance that had put him on notice that an optometrist had recommended the surgery. The Ninth Circuit stated that "a reasonable jury could find that Dr. Bannister, pursuant to a policy rather than a considered medical judgment, contributed to the decision to refuse treatment in conscious disregard of an excessive risk to Colwell's health." *Id*. (citing *Snow*, 681 F.3d at 989-90).

The Ninth Circuit remanded the matter for trial on the deliberate indifference issue. *Id*. at 1071.

### 3. Analysis

There is no doubt that Plaintiff's monocular blindness amounts to a serious medical need under *Colwell*. Like Colwell, Plaintiff is totally blind in one eye, and there is evidence in the record that his monocular blindness has caused him to run into things, to not see objects and people coming towards him. Moreover, the defense has acknowledged his monocular blindness qualifies as a serious medial need. (ECF No. 76-2 at 5:3-4.)

Therefore, the court will turn to the subjective prong of the Eighth Amendment claim— whether Dr. Aranas was deliberately indifferent.

Plaintiff argues that he has shown deliberate indifference to his serious medical need for over 20 years. He contends this is not a case where there is a difference of medical opinion. He maintains that the evidence is undisputed that Plaintiff was denied treatment for his monocular blindness solely because of NDOC's policies. It should be noted that this claim is proceeding only against Dr. Aranas, who assumed the position of NDOC's medical director in 2013.

Dr. Aranas argues that Plaintiff requested and saw many providers for his condition, and Dr. Seljestad told Plaintiff he had neurological damage and the eye could not be fixed. Nevertheless, on May 26, 2016, Plaintiff was scheduled by NDOC to see Dr. Fischer, an ophthalmologist. Dr. Fischer told Plaintiff he would write a letter advising NDOC of Plaintiff's need to have surgery by Dr. Hong, as he did not perform the surgery Plaintiff needed. Dr. Aranas acknowledges that Dr. Fischer did write a letter to NDOC. Plaintiff saw Dr. Hong on September 25, 2019, who recommended referral to a general ophthalmologist for cataract evaluation, and said the treatment was not urgent and was elective surgery. Plaintiff ultimately received the surgery he requested.

Dr. Aranas contends that he was not deliberately indifferent because Plaintiff received regular eye evaluations and surgical consultations. He further argues that a difference of opinion does not amount to deliberate indifference, and there is an argument that NDOC does not have "one good eye" policy. He also asserts that by Plaintiff's own admission, Dr. Aranas never treated or evaluated Plaintiff, and is not an ophthalmologist, and there is no evidence that Dr. Aranas was aware of Plaintiff's history. Finally, Dr. Aranas argues Plaintiff must demonstrate he was harmed by the deliberate indifference, citing the dissent in *Colwell*.

The court finds that in the end, there is a genuine dispute of material fact as to whether Dr. Aranas was deliberately indifferent to Plaintiff's serious medical need, which precludes the entry of summary judgment and requires a trial on the subjective element of Plaintiff's Eighth Amendment claim.

Plaintiff presents undisputed evidence that before he was transferred to NDOC it was recommended that he have cataract and eye realignment surgery. There was a subsequent entry in the progress notes by an unknown provider that stated probably nothing could be done for the right eye. In 2002, Dr. Scott said Plaintiff was a possible candidate for cataract surgery, and referred him for a consult; however, this was disapproved by the URP (well before Dr. Aranas' arrival at NDOC) without explanation. Plaintiff claims that two other unidentified doctors told him in 2003 and 2008 that he was a candidate for cataract surgery, but he would not get it because it was a cosmetic/elective procedure and NDOC had a policy to not approve cataract surgery unless the inmate's vision was significantly impaired in *both* eyes, i.e. a "one good eye" policy. As Dr. Aranas points out, Plaintiff has not identified these doctors, nor provided any medical records to corroborate the statements attributed to them.

21

While these doctors may have recommended cataract surgery, Plaintiff saw an optometrist, Dr. Seljestad, in February of 2016, who told Plaintiff he had neurological damage to his eye and would never see out of it. Dr. Wolff suspected Plaintiff may have some damage to the eye before performing the surgery, and post-surgical notes suggest Plaintiff did have optic nerve damage as a result of the traumatic injury to the right eye. Nevertheless, following Dr. Seljestad's appointment, Plaintiff was still ordered another consultation, and saw Dr. Fischer on May 26, 2016. Dr. Fischer thought Plaintiff needed strabismus surgery, and recommended Plaintiff see Dr. Hong in Reno, as he did not perform this surgery. Dr. Fischer sent a letter to NDOC with his recommendation.

When Dr. Aranas responded to Plaintiff's second level grievance, he noted he had reviewed Plaintiff's chart and grievances, and that Plaintiff had multiple appointments with providers and specialists. He repeated the first level grievance responder's statement that Plaintiff's injury was the result of a self-inflicted gunshot wound from 1999, and did not qualify as urgent care or life threatening. Dr. Aranas noted Plaintiff had seen another specialist; however, Dr. Aranas did not mention Dr. Fisher's recommendation that Plaintiff see Dr. Hong. Nor did he address the first level grievance responder's notation that the URP wanted Plaintiff to be seen by another in-house doctor. Instead, Dr. Aranas said Plaintiff would have a follow-up in a year.

Plaintiff did not see Dr. Hong, until three years later, after Plaintiff filed this lawsuit and he secured counsel.  This is a significant delay; however, Dr. Hong did note on her facsimile to Plaintiff's counsel that after her examination she did not deem the surgery urgent, and described it as "elective." Plaintiff ultimately saw Dr. Wolff, and received his requested surgery, which was unsuccessful in restoring his vision. While Plaintiff suggests that the surgery was unsuccessful

22

because of the long delay, he presents no evidence to support this contention. On the other hand, there are post-operative notes that indicate the lack of success may have been due to nerve damage to the eye from the traumatic injury.

Here, as in *Colwell,* there are opinions that Plaintiff required surgery, but unlike in *Colwell*, there is also an opinion by Dr. Seljestad that Plaintiff's eye could not be fixed with surgery and that it was stable, as well as Dr. Hong's notation that Plaintiff should go back for another cataract evaluation with a general ophthalmologist and that the surgery was not urgent and was elective. In denying Plaintiff's second level grievance, Dr. Aranas did not reference the "one good eye" policy. He did repeat the first level grievance responder's statement that Plaintiff's injury was from 1999 and did not qualify as urgent or life-threatening; however, he also stated that Plaintiff had been seen by NDOC providers and specialists and he reviewed Plaintiff's chart, which contained recommendations for surgery and a finding that Plaintiff's cataract was stable, as well as the statement in the grievance that Plaintiff had been told by one doctor that the surgery would not help him. The prior grievance responder had also indicated that Plaintiff was going to be seen by another "in house" eye doctor.

To be clear, this does not amount to a finding that Dr. Aranas was or was not deliberately indifferent to Plaintiff's serious medical needs. It simply means that there is a dispute of fact as to that issue. It is for the jury to decide whether the denial/delay in surgery was because of NDOC's "one good eye policy," a policy that precludes cosmetic/elective surgeries (which seems to encompass a determination that a surgery is preclude if it is not life threatening), as Plaintiff maintains, or because it was not medically indicated, as Dr. Seljestad opined, or that it was not urgent, as Dr. Aranas said in his grievance response, which also appears to be corroborated by Dr. Hong's statement in her note to Plaintiff's counsel.

Insofar as Plaintiff was eventually permitted to have surgery and the inquiry focuses on a delay claim, the court must look at whether Plaintiff suffered harm as a result of the delay. Dr. Aranas argues that Plaintiff has not demonstrated he was harmed. Dr. Aranas relies on the dissenting opinion in *Colwell;* however, the majority in *Colwell,* which is controlling here, held: "as long as the eye remains untreated, [the inmate] continues to suffer blindness in his right eye, which is harm in and of itself, along with all of the other harms and dangers that flow from that." *Id*. Moreover, Dr. Aranas does not address Plaintiff's statements in his declaration that he was hit by objects, bumped into walls and other inmates, could not participate in sporting activities, and could not see another inmate approach him before an assault, which all are evidence of harm. The one piece of evidence Dr. Aranas points to that does suffice to create a genuine dispute of fact on this issue is Dr. Hong's statement that the surgery was not urgent and that it was elective.

While there are disputed facts that require this claim to be presented to the jury, some of Dr. Aranas' arguments require further discussion.

Dr. Aranas states that there is an *argument* that there is no "one good eye" policy in NDOC. The only evidence that appears to support this argument is the declaration of Chief of Nursing Services Theresa Wickham. She states that there is no policy, written or unwritten, that "one eye is good enough" and that NDOC will categorically deny medically indicated surgery for one-eyed prisoners. (Wickham Decl., ECF No. 93-11 at 3 ¶ 11.) Ms. Wickham acknowledges NDOC's Medical Directive pertaining to cataract surgery, Medical Directive 123. (Id. ¶ 12.)

NDOC's policy speaks for itself. While the medical directive in effect in the *Colwell* case did not specifically state in writing that an inmate would be denied cataract surgery if he had

"one good eye,"[5] NDOC's current Medical Directive 123 essentially states just that: "There must be documentation of a best corrected visual acuity of less than 20/60 *in both eyes* with current (less than 6 months) refraction." (ECF No. 76-4 at 6.) So, if an inmate has normal visual acuity in one eye, or more than 20/60 visual acuity in one eye, the inmate is not eligible for cataract surgery within NDOC. In other words, if the inmate has "one good eye," he is not eligible for cataract extraction. The question for the jury, however, is whether that was the basis for Dr. Aranas' denial/delay of Plaintiff's surgery, as Plaintiff contends. Dr. Aranas does not attempt to explain how this policy means something other than "one good eye" excludes a patient from being considered for cataract surgery.

Dr. Aranas also argues that he never treated Plaintiff, he is not an ophthalmologist, and that there is no evidence he knew of Plaintiff's history to satisfy the subjective prong of the Eighth Amendment claim. First, the Ninth Circuit clearly rejected a similar argument asserted by NDOC's then-medical director Dr. Bannister in the *Colwell* case, whose involvement was also responding to the inmate's second level grievance. Moreover, the position Dr. Aranas' now takes ignores that Plaintiff repeated much of the history of his eye condition in his grievance, which Dr. Aranas specifically said he reviewed in responding to the second level grievance. What is more contradictory is the fact that in his second level grievance response, Dr. Aranas specifically states that he reviewed Plaintiff's chart. Therefore, he was admittedly aware of Plaintiff's history. Finally, it is of little consequence that Dr. Aranas is not an ophthalmologist. He was the medical director of the prison. Presumably, he is not an oncologist, nor an endocrinologist or orthopedic

---

[5] Instead of a formal written policy, Colwell presented evidence he was told this by medical providers and in response to grievances.

surgeon; however, that does not mean he is free to ignore the medical complaints of inmates with

cancer, diabetes, or broken bones, simply because he does not specialize in those fields.

In sum, Plaintiff's motion for summary judgment as to the Eighth Amendment deliberate

indifference to serious medical needs claim should be denied, and the claim should proceed to

trial on the subjective element of that claim.

## C. ADA vs NDOC

### 1. Title II of the ADA

"Congress enacted the ADA in 1990 to remedy widespread discrimination against

disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). "To effectuate its

sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of

public life, among them employment (Title I of the Act), public services (Title II), and public

accommodations (Title III)." *Id*. This action involves a claim under Title II of the ADA.

Under Title II of the ADA, "a qualified individual with a disability" cannot "by reason of

such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C. § 12132.

Thus, to establish a violation of Title II of the ADA, plaintiff must demonstrate that:

> (1) he is an individual with a disability; (2) he is otherwise
> qualified to participate in or receive the benefit of some public
> entity's services, programs, or activities; (3) he was either excluded
> from participation in or denied the benefits of the public entity's
> services, programs, or activities, or was otherwise discriminated
> against by the public entity; and (4) such exclusion, denial of
> benefits, or discrimination, was by reason of [his] disability.

*McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (citation and quotation marks

omitted); *see also Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002).

26

The Supreme Court has confirmed that state prisons qualify as a public entity under Title II of the ADA. *See United States v. Georgia*, 546 U.S. 151, 154 (2006) (citation omitted); *Pennsylvania. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998).

Discrimination under the ADA includes a public entity's failure to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity." 28 C.F.R. § 35.130(b)(7).

"To recover monetary damages under Title II of the ADA … a plaintiff must prove intentional discrimination on the part of the defendant." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) (citation omitted). To establish intentional discrimination, the plaintiff must show the defendant acted with "deliberate indifference." *Id*. "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id*. at 1139 (citation omitted).

A plaintiff must "identify 'specific reasonable' and 'necessary' accommodations that the defendant failed to provide." *Id*. "When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Id*.

On receiving the request for accommodation, the public entity "is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation[.]" *Id*. "[I]t must consider the particular individual's need when conducting its investigation into what accommodations are reasonable." *Id*. "[I]n order to meet the second element of the deliberate

1  indifference test, a failure to act must be a result of conduct that is more than negligent, and

2  involves an element of deliberateness." *Id*. (citation omitted).

3        **2. Can Plaintiff Proceed with this Claim under the ADA?**

4        The court must first address Defendants' argument that Plaintiff is attempting to create an

5  end-run around the Eighth Amendment by claiming violation of the ADA for failing to give him

6  medical treatment. Defendant argues that the Ninth Circuit does not allow an ADA claim for

7  inadequate treatment for disability, citing *Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th

8  Cir. 2010); *Marlor v. Madison County*, 50 Fed.Appx. 872, 874 (9th Cir. 2002); *King v.

9  Calderwood*, 2:13-cv-02080-GMN-PAL, 2015 WL 4937953, at *2 (D. Nev. Aug. 19, 2015); and

10 *Sutton v. Nevada*, No. 3:19-cv-00268-MMD-WGC, 2019 WL 3939061, at *6 (D. Nev. July 30,

11 2019), report and recommendation adopted at 2019 WL 3937632 (Aug. 19, 2019).

12       Plaintiff alleges that he was discriminated against when NDOC failed to modify its

13 policies to allow him to have surgery for blindness in his right eye (which is his asserted

14 disability). The issue of whether he may proceed with this claim under the ADA and whether he

15 has demonstrated that he was discriminated against by reason of his disability are necessarily

16 intertwined. *See e.g. O'Guinn v. Nev. Dep't of Corr.*, 468 Fed.Appx. 651, 653 (9th Cir. 2012)

17 (citing *United States v. Univ. Hosp. State Univ. of New York at Stony Brook*, 729 F.2d 144, 156

18 (2d Cir. 1984)).

19       In *Simmons*, the parents of a 17 year-old brought suit against the jail and county asserting

20 claims under section 1983 and ADA, as well as state law claims, after their son committed

21 suicide while detained in the  jail. They argued his depression qualified as a disability under the

22 ADA, and the jail failed to accommodate it when they denied access to outdoor recreation and

23 failed to place him in a more appropriate facility. The Ninth Circuit disagreed, pointing out that

he was deprived of outdoor recreation before he was placed on suicide watch, and the denial of outdoor exercise was not because of his depression, but because there was a policy restricting outdoor recreation to inmates that were on suicide watch. *Simmons*, 609 F.3d at 1021. *Simmons* stated: "The ADA prohibits discrimination because of disability, not inadequate treatment for disability." *Id.* at 1022 (citing *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)).

In *Marlor v. Madison County Idaho*, 50 Fed.Appx. 872, 874 (9th Cir. 2002), the plaintiff claimed the jail violated the ADA by failing to provide him with medical equipment (rubber crutch tips). In this unpublished decision, the Ninth Circuit held that "[i]nadequate medical care does not provide a basis for an ADA claim unless medical services are withheld *by reason of* a disability." 50 Fed.Appx. at 873 (citations omitted).

In *King v. Calderwood*, No. 2:13-cv-02080-GMN-PAL, District Judge Navarro pointed out that allowing inmates to use the ADA as a cause of action for not receiving medical treatment simply makes "an end run around the Eighth Amendment." *King*, 2015 WL 4937953, * 2 (citing *Deeds v. Bannister*, 3:11-cv-00351-LRH-VPC, 2013 WL 1250343 (D. Nev. Jan. 8, 2013)).

The Supreme Court has noted, however, that "it is quite plausible that the alleged deliberate refusal of prison officials to accommodate [an inmate's] disability-related needs in such fundamentals as … medical care … constitute[s] exclusion from participation in or … denial of the benefits of the prison's services, programs, or activities." *Georgia*, 546 U.S. at 157 (alterations and internal quotation marks omitted.)

As one judge in the Eastern District of California put it: "There is [,however;] no clear guidance as to whether [or under what circumstances] a plaintiff may ever state a failure to accommodate claim under the ADA … based on a correctional facility's failure to provide

29

medical treatment for a disability." *Atayde v. Napa State Hospital*, 255 F.Supp.3d 978, 1001 (E.D. Cal. 2017).

Addressing under what circumstances the ADA affords a remedy when the plaintiff alleges a denial of medical treatment, *Atayde* noted that some courts have identified ADA violations "where the denial of medical care is so extreme as to suggest discriminatory refusal to accommodate a disability-related need, such as when a disabled detainee is denied a broad range of medical services beyond those necessary for treating his underlying disability." *Id.* at 1001-02 (citing *Lonergan v. Florida Dep't of Corr.*, 623 Fed.Appx. 990, 994 (11th Cir. 2015) (plaintiff stated an ADA discrimination claim where it was alleged that the prison failed to give him the treatment prescribed his dermatologist because he pled "more than the mere disagreement with his medical treatment."); *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 285-87 (1st Cir. 2006) (found a triable issue of fact existed as to whether the prison violated the ADA when it failed to give the inmate plaintiff his medications because the "outright denial of medical services" was "so unreasonable as to demonstrate that they were discriminating against him because of his disability."); *Mitchell v. Williams*, No. 6:15-cv-93, 2016 WL 723038, at *3-4 (S.D. Ga. Feb. 22, 2016) ("Plaintiff alleges more than mere disagreement with his medical treatment. Rather, he states that the Department of Corrections has refused to provide him treatment for his Hepatitis C."); *Anderson v. County of Siskiyou*, No. C 10-01428 SBA, 2010 WL 3619821, at *5 (N.D. Cal. Sept. 13, 2010) (plaintiff stated a cognizable ADA claim by alleging "that Defendants failed to provide [plaintiff] with any access to mental health programs and services," because plaintiff had alleged an "outright denial of medical services"); *Payne v. Arizona*, No. CV-09-1195-PHX-NVW, 2010 WL 1728929, at 84 (D. Ariz. April 26, 2010) ("[W]here a plaintiff's factual allegations paint a picture of mere negligence in the provision of

medical services, a Title II ADA claim cannot lie. On the other hand, where they indicate an outright and deliberate denial or refusal of access to medical care for a qualifying disability, a plaintiff may proceed under Title II.")[6]; *McKissick v. County of York*, No. 1:09-cv-01840, 2010 WL 1920132, at \*6 (M.D. Penn. Mar. 19, 2010) (plaintiff stated cognizable discrimination claim under ADA by alleging defendants denied decedent his prescribed medications, distinguishing the allegations form those involving medical negligence); *Hughes v. Colo. Dep't of Corr.*, 594 F.Supp.2d 1226, 1241-42 (D. Colo. 2009) (plaintiff stated cognizable ADA claim by alleging that defendants "completely denied him access to medical treatment for his mental disability," because he was "precluded from access to medical treatment altogether").

Other courts, have found no cognizable ADA claim "where there is the alleged denial only of those services necessary for addressing a disability, and where the surrounding circumstances do not otherwise suggest a deliberate refusal to accommodate*." Atayde*, 255 F.Supp.3d at 1002 (citing *Grzan v. Charter Hosp.*, 104 F.3d 116, 121-22 (7th Cir. 1997) (plaintiff did not state ADA claim for denial of psychiatric treatment because "absent her handicap, she would not have been eligible for treating in the first place"); *Johnson v. Thompson*, 871 F.2d 1487, 1493-94 (10th Cir. 1992) (no Rehabilitation Act claim where plaintiff "would not need the medical treatment" in the absence of the disability); *O'Guinn v. Nev. Dep't of Corr.*, 468 Fed.Appx. 651, 653 (9th Cir. 2012) (plaintiff claimed he was "discriminatorily denied mental health treatment because of his mental health disability" and court found "he only needed the

---

[6] In *Payne*, the court found that the fact that the inmate received some medical care did not "dispositively preclude Plaintiff from sustaining a claim under Title II of the ADA." *Payne*, 2012 WL 1151957, at \*6 (citing *Kiman*, 451 F.3d at 284-90). Instead, the court concluded that "whether and when the ADA supports claims by prisoners regarding a prison's medical and nutritional services is a close question that turns on distinguishing actionable claims of 'denial of medical treatment' from non-actionable claims of mere inadequate or negligent medical treatment." *Id*. (citing *Kiman*, 451 F.3d at 284).

1 treatment because he was disabled," so "not only is the 'handicapping condition … related to the

2 condition(s) to be treated,' they are inextricably linked.")).[7] Under this approach, a plaintiff must

3 assert that he was denied "medical services beyond those necessary for treating his underlying

4 disability." *Id.*

5       Along these lines, in *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134,

6 1144 (10th Cir. 2005), the Tenth Circuit said, "As to whether treatment was denied "solely" by

7 reason of disability, the Second Circuit has stated: "Where the handicapping condition is related

8 to the condition(s) to be treated, it will rarely, if ever, be possible to say … that a particular

9 decision was 'discriminatory.'" 403 F.3d at 1144 (quoting *United States v. University Hospital*,

10 729 F.2d 144, 157 (2nd Cir. 1984).) In *Fitzgerald*, the alleged disability was the reason why he

11 was seeking medical treatment. The Tenth Circuit concluded that he "would not have been

12 'otherwise qualified' for such treatment in the absence of his alleged disability[.]" *Id.* "These are

13 the sort of purely medical decisions that we have held do not ordinarily fall within the scope of

14 the ADA[.]" *Id.*

15       Admittedly, whether Plaintiff may proceed with his claim under the ADA in this case is a

16 very close call. Plaintiff claims that he was denied care for his vision because of his disability:

17 his monocular blindness. That is to say, he argues that he was denied surgery pursuant to NDOC

18 policy *because* he was blind in only one eye. In screening the TAC, the court found that

19 Plaintiff's allegations were sufficient to allow the claim to proceed.

20       At the summary judgment stage, however, the court finds that there is an obvious dispute

21 of material fact as to whether Plaintiff was denied surgery because of his disability, which is

22

23 [7] The plaintiff argued that his action did not arise from inadequate treatment but from "a total lack of treatment." The Ninth Circuit panel concluded, however, that he "fail[ed] to identify any evidence in the record suggesting such a denial of care." *O'Guinn,* 468 Fed.Appx. at 653.

essential to his claim related to his medical care at NDOC being allowed to proceed under the ADA in the first place, and is an essential element of his ADA claim. The factual dispute is outlined with respect to the Eighth Amendment: it is unclear whether Plaintiff was denied surgery because of the "one good eye" policy, a policy that non-life threatening, cosmetic, or elective injuries should not receive surgery, or because surgery was not medically indicated, was not urgent or would not help Plaintiff. If the fact-finder determines Plaintiff was denied surgery because it was not medically indicated, then it cannot be said he was denied surgery because of his disability.

If, on the other hand, a fact-finder determines that Plaintiff was denied surgery because of a "one good eye" policy, then such a policy could be considered a denial of care that is "so extreme as to suggest a discriminatory refusal to accommodate a disability-related need." Or, under the other line of cases, since surgery is the only treatment for a cataract, it could be considered as suggestive of a deliberate refusal to accommodate a disability.

Since there is a genuine dispute of material fact as to the basis for denial of surgery, Plaintiff's motion for partial summary judgment must necessarily be denied as to the Title II ADA claim which requires Plaintiff to demonstrate that the denial of surgery was because of his disability.

The defense briefly argues that the motion for summary judgment should be denied as to the ADA claim because Plaintiff did not properly request an accommodation for disability pursuant to NDOC's AR 658. This is essentially an affirmative defense akin to failure to exhaust that the defense is required to plead and prove; however, NDOC cites no evidence to support its assertion that Plaintiff did not file a request form under AR 658, as it is required to do under Rule

56. AR 658 states that its purpose is to ensure that NDOC is compliant with the ADA, not to ensure an inmate exhausts administrative procedures before filing a lawsuit pursuant to the ADA.

In addition, AR 658 discusses when an inmate is identified as having a disability upon intake and the procedure for requesting a reasonable accommodation (through a grievance), and when an inmate has not been identified as having a disability on intake and the procedure for requesting an accommodation at that juncture, through the request form. Plaintiff's undisputed testimony is that he was taken into custody of NDOC in 2001 with the severe cataract in his right eye; therefore, it appears that he should have been identified as having a disability upon intake. NDOC presents no evidence one way or the other on this topic.

Nor does NDOC cite any authority to support the proposition that an inmate must comply with an internal regulation to submit a form requesting an accommodation before he may file a federal claim under the ADA. Title II of the ADA does not require any sort of administrative exhaustion before filing suit. Contrary to NDOC's argument in response to Plaintiff's second motion for partial summary judgment, it is the PLRA that requires an incarcerated inmate to exhaust administrative remedies before filing a federal ADA claim. Typically, exhaustion of administrative remedies is analyzed within the context of the prison's grievance procedures. NDOC does not specifically make the argument that in exhausting administrative remedies, an inmate filing an action asserting an ADA claim must first proceed through NDOC's grievance process in AR 740 *and also* file the AR 658 request form within the prison. Therefore, the court will not address that argument now, other than to point out that AR 658 itself does not state that an inmate must fill out the request form before filing an ADA claim in federal court.

In light of the conclusion that there is an issue of fact that precludes the determination of whether Plaintiff has an actionable ADA claim, summary judgment should be denied as to the

Title II ADA claim, and the court need not discuss the other elements of the ADA claim raised in Plaintiff's motion.

### IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING** Plaintiff's Second Motion for Partial Summary Judgment (ECF No. 76).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: February 5, 2021

William G. Cobb
United States Magistrate Judge