TERRI KEYSER-COOPER, NV Bar 3984
DIANE K. VAILLANCOURT, NV Bar 9277
PETER C. WETHERALL, NV Bar 4414
c/o Law Office of Terri Keyser-Cooper
2395 Viejo Place
Lake Havasu City, AZ 86406
(775) 337-0323
keysercooper@lawyer.com
vaillancourt@cruzio.com
pwetherall@wetherallgroup.com
*Attorneys for Plaintiff Clifford Miller*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

CLIFFORD W. MILLER,

      Plaintiff,

      vs.

ROMEO ARANAS, et al.,

      Defendants.

_____/

Case No. 3:17-cv-00068-MMD-CSD

**PLAINTIFF'S MOTION FOR
ATTORNEYS' FEES AND COSTS**

## NOTICE OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS

      To Defendants and their attorneys of record, Plaintiff Clifford W. Miller brings this Motion for Attorneys' Fees and Costs. He does so pursuant to the terms of the stipulated Dismissal with Prejudice and attached Settlement Agreement, in which the Court retained jurisdiction over the matter of fees and costs. ECF 138.

# TABLE OF CONTENTS

I.    NDOC'S SCORCHED EARTH DEFENSE COST PLAINTIFF ENORMOUS TIME, RESOURCES, AND ATTORNEY EFFORT ..... 1

    A.    Defendants' Scorched Earth Defense Culminated in an Eve-of-Trial Settlement ..... 1

    B.    Defendants' Ignoring the Mandatory Precedent of *Colwell v. Bannister*, a Case Directly on Point, Set This Case on Its Long Path to Justice for Plaintiff Miller ..... 3

II.   WHILE HER SETTLEMENT EFFORTS MET STRONG RESISTANCE, MS. KEYSER-COOPER'S ADVOCACY AND PRE-TRIAL MOTIONS OBTAINED RELIEF FOR PLAINTIFF AND FURTHERED HIS CLAIMS ..... 3

III.  PLAINTIFF'S THREE CLAIMS SET FOR TRIAL AND RELIEF OBTAINED ..... 5

    A.    The Main Task in Proving Plaintiff's § 1983 Claim Was to Bring to Light Dr. Aranas's Subjective Indifference to Plaintiff's Serious Medical Condition ..... 5

    B.    Plaintiff's ADA Title II Reasonable Accommodation Claim Demanded Substantial Legal Research, Analysis, and Clarification ..... 7

        1.    NDOC's "One Good Eye" Policy Constitutes Discrimination Under the ADA Because It Establishes an Eligibility Criterion That Excluded Mr. Miller ..... 8

        2.    NDOC Used Its "One Good Eye" Policy to Reject Mr. Miller for Cataract Surgery ..... 8

        3.    Causation Was Established With NDOC's Refusal to Accommodate Mr. Miller's Disability Given Availability of a Reasonable Accommodation. ..... 9

        4.    The Reasonable Accommodation Mr. Miller Sought Was a Readily Available Exception to NDOC's Discriminatory "One Good Eye" Policy ..... 10

        5.    NDOC was Deliberately Indifferent to Mr. Miller's Efforts to Seek a Reasonable Accommodation to Its "One Good Eye" Policy ..... 10

    C.    In his ADA Retaliation Claim, Plaintiff Sought and Obtained Removal of His Discipline for Protected Activity from His Record ..... 11

IV.   PLAINTIFF ACHIEVED EXCELLENT SUCCESS ON ALL HIS CLAIMS ..... 11

V.    PLAINTIFF'S COUNSEL ARE FULLY ENTITLED TO THEIR "REASONABLE AND VERIFIABLE" FEE ..... 13

A.  **Plaintiff is the Prevailing Party, Entitling His Attorneys to their Reasonable Fee** **13**

B.  **Plaintiff's Entitlement to Attorneys' Fees Is Not Limited by the Prison Litigation Reform Act (PLRA)** **14**

    1.  **PLRA Fee Caps Do Not Apply Where Parties Settle Privately and Include Attorney Fee Provisions Outside the PLRA's 150% Cap** **14**

    2.  **PLRA Fee Caps Do Not Apply to Prison ADA Cases** **15**

    3.  **PLRA Fee Caps Do Not Apply to Prison § 1983 Claims Involving Equitable Relief** **15**

C.  **Awarding Substantial Attorneys' Fees Meets the Fundamental Objective of Encouraging Meritorious Civil Rights and ADA Cases** **15**

VI.  **APPLICATION OF THE *KERR* FACTORS JUSTIFIES THE FULL ATTORNEYS' FEES REQUESTED** **17**

A.  **The Time and Labor Required** **17**

B.  **The Novelty and the Difficulty of the Questions Involved** **18**

C.  **The Undesirability of the Case** **18**

D.  **The Amount Involved and the Benefits Obtained** **20**

E.  **The Customary Fee** **21**

    1.  **Terri Keyser-Cooper** **21**

    2.  **Diane K. Vaillancourt** **22**

    3.  **Peter C. Wetherall** **22**

F.  **Whether the Fee Is Fixed or Contingent** **23**

G.  **Itemization of Time Records** **24**

H.  **Plaintiff Miller's Costs Are Also Compensable** **24**

VII.  **CONCLUSION** **24**

# TABLE OF AUTHORITIES

## Cases

*Alvarado v. Cajun Operating Co.,* 588 F.3d 1261, 1270 (9th Cir. 2009)  12

*Armstrong v. Davis,* 318 F.3d 965, 973-75 (9th Cir. 2003)  14-15

*Barjon v. Dalton,* 132 F. 3d 496, 500 (9th Cir. 1997)  21

*Barrios v. California Interscholastic Federation,* 277 F.3d 1128 (9th Cir. 2002  13-14, 20

*Blackwell v. Foley,* 724 F. Supp. 2d 1068, 1075 (N.D. Cal. 2010)  15-16

*Blum v. Stenson,* 465 U.S. 886, 895 & n.11 (1984)  21

*Bruce v. City of Gainesville, Ga.,* 177 F.3d 949, 952 (11th Cir. 1999)  15

*Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Res.,* 532 U.S. 598 (2001)  13

*Carson v. Billings Police Depart.,* 470 F.3d 889, 891 (9th Cir. 2005)  21

*Chalmers v. City of Los Angeles,* 676 F. Supp. 1515, 1530 (C.D. Cal. 1987)  23

*Clopp v. City of Sparks,* 3:30-00465 (case pending)  21

*Colwell v. Bannister,* 763 F.3d 1060, 1063 (9th Cir. 2014)  passim

*Common Cause v. Jones,* 235 F. Supp. 2d 1076, 1081 (C.D. Cal. 2002)  21

*Crowder v. Kitagawa,* 81 F.3d 1480, 1485 (9th Cir. 1996)  9

*Dannenberg v. Valadez,* 338 F.3d 1070, 1075 (9th Cir. 2003)  15

*Doud v. Yellow Cab,* 3:13-cv-00664 (ECF No. 94, p. 9, May 18, 2015)  21

*Duvall v. County of Kitsap,* 260 F.3d 1124, 1138 (9th Cir. 2001)  10

*Gonzalez v. City of Maywood,* 729 F.3d 1196, 1202 (9th Cir. 2013)  21

*Harris v. Maricopa County Superior Court,* 631 F.3d 963, 971 (9th Cir. 2011)  18-19

*Hensley v. Eckerhart,* 461 U.S. 424 (1983)  17

*Jones v. Diamond,* 636 F.2d 1364, 1381-82 (5th Cir. 1981) (*en banc*)  15, 23

*Kerr v. Screen Guild Extras, Inc.,* 526 F.2d 67, 69-70 (9th Cir. 1975)  17

*Labotest, Inc. v. Bonta,* 297 F.3d 892, 895 (9th Cir. 2002)  13

*LaPlante v. Pepe,* 307 F. Supp. 2d 219, 223-25 (D. Mass. 2004)  14

*Lipsett v. Blanco,* 975 F.2d 934, 939 (1st Cir. 1992) — 21

*McGary v. City of Portland,* 386 F.3d 1259, 1266 (9th Cir. 2004) — 7-8

*Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) — 17

*PGA Tour, Inc. v. Martin,* 532 U.S. 661 (2001) — 10

*Richard S. v. Department of Developmental Services,* 317 F.3d 1080 (9th Cir. 2003) — 14

*San Bernardino Valley Audubon Society, Inc. v. County of San Bernardino*, 155 Cal. App. 3d 738, 755 (1984) — 16

*Torres v. Walker*, 356 F.3d 238, 245 (2nd Cir. 2004) — 14

*Walker and Adams v. Carnival Cruise Lines, Inc.,* 63 F. Supp. 2d 1083 (N.D. Cal. 1999) — 16

*Woodland Hills Residents Ass'n, Inc. v. City Council,* 23 Cal. 3d 917, 933 (1979) — 16

*Yates v. Mobile County Personnel Bd.,* 719 F.2d 1530, 1534 (11th Cir. 1983) — 23

**<u>Other Sources</u>**

28 C.F.R. § 35.130(b)(7) — 9

42 U.S.C. § 1983 — passim

42 U.S.C. § 1997e(d) — 14-15

Americans with Disabilities Act — passim

1

2

## I.    NDOC'S SCORCHED EARTH DEFENSE COST PLAINTIFF ENORMOUS TIME, RESOURCES, AND ATTORNEY EFFORT

3

### A.  Defendants' Scorched Earth Defense Culminated in an Eve-of-Trial Settlement

4       This was a bitterly contested case and unnecessarily so. For several years, defendants NDOC and

5   Dr. Aranas budged not one iota toward resolving plaintiff Miller's claims, not even after being confronted

6   with counsel Terri Keyser-Cooper's several efforts to show them the writing on the wall and settle the

7   matter. Instead, these defendants mounted a classic Stalingrad scorched earth defense, resisting plaintiff at

8   every turn only because they could.[1] That strategy had worked for defendants time and again in the

9   multitude of inmate cases brought against them. Experience had taught them that inmate plaintiffs –

10  regardless of the merit of their claims – have every strike against them. Defendants, on the other hand,

11  enjoy the power and resources of the Nevada Attorney General's Office. Better yet, they have the Prison

12  Litigation Reform Act with its hurdles, strictures and pitfalls for inmates seeking redress for constitutional

13  wrongs, starting with having to exhaust grievance processes and risking punishment in the event of some

14  perceived transgression. Rare is the inmate who finds counsel willing and adequately experienced to

15  prosecute their claims. Here the PLRA sets another hurdle with its miserly caps on attorneys' fees in §

16  1988 cases.

17      Also should the inmate plaintiff seek injunctive relief, the prison has a near surefire way to evade

18  accountability: by "voluntarily" granting the sought relief after the plaintiff has commanded the court's

19  attention with a compelling motion for injunctive relief but has yet to gain a court order. In such a case,

20  plaintiff's counsel loses all entitlement to fees for their effort because courts feel compelled to declare the

21  matter moot and the catalyst theory of attorney fee recovery no longer exists. Plaintiff Miller's case could

22  have fallen into that trap as well when NDOC granted him the cataract surgery he had sought for twenty

    years had his counsel not skillfully researched and pled his claims.

23      Preparing an inmate rights case for jury trial presents the biggest hurdle. The path to victory is

24  narrow with twists and turns along the way. For starters, convicts serving lengthy sentences for presumably

25  abhorrent acts face deep prejudice in the jury pool. Humanizing these inmate plaintiffs before the jury is

26

27  [1] It is believed that the fault here lies squarely with the NDOC defendants and not their counsel.

28

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

an uphill battle. So too is the job of restraining the defendants from hammering on the theme of the inmate's convict status. In the event of a favorable verdict, obtaining more than *de minimis* damages for these plaintiffs demands a herculean effort on the part of their counsel.

What sets this case apart from the multitudes of inmate cases that utterly fail is that inmate Miller had the persistence and good fortune to persuade civil rights attorney Terri Keyser-Cooper of the merit of his claims and the reprehensibility of the defendants' conduct. He found the exceptional attorney who would not let the defendants exploit the power differences, PLRA's strictures, and mootness threat to stonewall his meritorious claims. Ms. Keyser-Cooper's experience, dedication, and determination have carried the day for plaintiff Miller. From her several years volunteering on the Court's *pro bono* committee, she is acutely aware of the hurdles and traps inmates regularly face in litigating against their jailers, and she was well-prepared to navigate them.

This particular inmate case presented additional thorny issues revolving around the interplay between the Eighth Amendment, the ADA, and the PLRA, all of which demanded extensive legal research and analysis. Ms. Keyser-Cooper labored three years on this case attempting to persuade defendants to settle the matter at little cost to them while scoring many victories along the way with no guarantee of compensation for her efforts. As the time for trial approached, she recognized the need to recruit two out-of-area lawyers to join her team: Peter Wetherall, a top Las Vegas trial lawyer with over thirty years' litigation experience and fifty jury trials under his belt, and Diane Vaillancourt, a California lawyer with background in the ADA plus twenty-four of her thirty-year law practice litigating exclusively civil rights cases.

Because of the defendants' stonewalling strategy, these three highly skilled, very experienced and determined lawyers have had to expend over a thousand hours shepherding this case to the eve of trial and ultimate settlement. After extensive motions in limine were filed, jury instructions prepared, exhibit books tabbed, trial briefs finalized, witness examinations prepared, and additional trial preparations completed, providing for judgment to be entered against defendant Aranas and in favor of plaintiff Miller for $7,500 "exclusive of reasonable and verifiable costs and attorneys' fees…." (Exh. 1: OOJ).  Unwilling to accept the Offer of Judgment as it stood, Mr. Miller and his counsel reached out to defendants with a counterproposal adding defendant NDOC as a settlor and incorporating the equitable relief Mr. Miller had

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                    2

sought in addition to the $7,500 in monetary damages and attorneys' fees and costs. Within a day, defendants accepted plaintiff's proposal. Thus plaintiff obtained the Settlement Agreement he had sought all along, including his requested equitable relief. (Exh. 2: Settlement Agreement). Had defendants entered this same settlement years before, they would have avoided the bulk of attorneys' fees and costs now requested. Their intransigence in Mr. Miller's case has come at a steep price.

**B. Defendants' Ignoring the Mandatory Precedent of _Colwell v. Bannister, a_ Case Directly on Point, Set This Case on Its Long Path to Justice for Plaintiff Miller**

Rarely in the law is there specific mandatory case precedent precisely on point that firmly supports a plaintiff's legal stance. Lawyers value and courts depend upon such precedents for cases that follow with practically identical facts. On August 14, 2014, the Ninth Circuit published its opinion in _Colwell v. Bannister,_ a prior case against NDOC with near identical facts to Mr. Miller's. _Colwell v. Bannister,_ 763 F.3d 1060 (9th Cir. 2014). The appellate court held that:

> [T]he blanket, categorical denial by Nevada prisons of corrective cataract surgery based solely on administrative **_policies_** prohibiting such surgeries if the inmate has "one good eye" and the condition is not "life threatening" is the "paradigm of deliberate indifference."

_Id._ at 1063 (emphasis added). The Ninth Circuit also held that "blindness in one eye caused by a cataract is a serious medical condition." _Ibid._ Despite such clear, unambiguous holdings, defendants ignored the _Colwell_ mandate, conducting themselves as though it did not exist. They went so far as to set NDOC's "one-good-eye" policy in stone a year or two later with Medical Directive 123.03, which defendant Aranas signed off on in his capacity as NDOC's Medical Director. (Exh. 3: MD 123.03). As part of the equitable relief obtained in satisfaction of plaintiff's ADA Title II/§ 1983 claims, defendants agreed to amend NDOC's policies and procedures concerning inmates with monocular blindness to conform with _Colwell's_ mandate. This was a gigantic accomplishment for plaintiff Miller the benefit of which extends far beyond himself.

**II.   WHILE HER SETTLEMENT EFFORTS MET STRONG RESISTANCE, MS. KEYSER-COOPER'S ADVOCACY AND PRE-TRIAL MOTIONS OBTAINED RELIEF FOR PLAINTIFF AND FURTHERED HIS CLAIMS**

Ms. Keyser-Cooper formally appeared in the case on August 27, 2019, but, as her timesheets show, her advocacy efforts on Mr. Miller's behalf began much earlier, on March 26, 2019, when Mr. Miller wrote her a letter describing his predicament. From the start, Ms. Keyser-Cooper attempted to persuade

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

_Miller v. Aranas_: Plaintiff's Motion for Attorneys' Fees and Costs                    3

defendants simply to grant Mr. Miller the relief he was seeking (essentially what he obtained in the Settlement Agreement) and move on. She first reached out to defendants in efforts to settle the matter on December 2, 2019, May 1 and 5, 2020, June 11, 2020, and July 1, 2020. From August 3, 2020 to October 16, 2020, she devoted the bulk of her labor to persuading the parties to see the merits in settling the matter while diligently preparing for a upcoming settlement conference. Again in mid-March 2021, Ms. Keyser-Cooper made a further attempt to encourage settlement discussions. (Exh. 10, ¶10).

In response to her settlement efforts, defendants planted their feet in cement and refused to budge. One issue in particular, NDOC's punishing Mr. Miller for filing his ADA grievance and thereby engaging in protected activity, seemed to Ms. Keyser-Cooper to be a no-brainer, easily resolved at no cost to NDOC. Mr. Miller, having followed his counsel's advice by grieving his ADA claim, was panicking because NDOC, by disciplining him, was cutting off his slim chance for a pardon. This was his first discipline in twenty-plus years of incarceration, and its impact on Mr. Miller was devastating. But NDOC remained intransigent. (Exh. 10, ¶¶8, 10).

Notwithstanding defendants' intransigence, Ms. Keyser-Cooper achieved certain successes along the way. Her first motion for preliminary injunction achieved Mr. Miller's opportunity to see strabismus surgeon Dr. Hong for a surgical evaluation. This was three years after ophthalmologist Dr. Fischer had made the referral, which referral was made a mere five months before Dr. Aranas rejected Mr. Miller's grievance seeking surgery. Her second motion for preliminary injunction achieved NDOC's agreement to have Mr. Miller evaluated for cataract surgery and follow up with the surgery if recommended, which it was. (Exh. 10, ¶10).

In addition, although plaintiff did not succeed in establishing liability as a matter of law, Ms. Keyser-Cooper's motions for partial summary judgment addressing his three claims achieved clear articulation by the Court of what issues of fact were established as a matter of law and what issues it believed demanded trial. Aside from helping to create a roadmap for trial, these decisions by the Court gave defendants a clear message of problems inherent in their stance. This was another opportunity for defendants to settle the matter at far less cost in attorneys' fees, but they ignored it.

III.    **PLAINTIFF'S THREE CLAIMS SET FOR TRIAL AND RELIEF OBTAINED**

    A.    **The Main Task in Proving Plaintiff's § 1983 Claim Was to Bring to Light Dr. Aranas's Subjective Indifference to Plaintiff's Serious Medical Condition**

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                    4

Mr. Miller began this litigation in 2017 by filing *in pro per* a § 1983 complaint alleging deliberate indifference to his serious medical need. Following initial screening, the Court limited his complaint. Upon appearing in the case, Ms. Keyser-Cooper immediately moved to amend the complaint and further eliminated the nonviable defendants from the § 1983 claim while adding the ADA Title II claim. What remained of the § 1983 claim was one sole defendant, Dr. Aranas, and one sole incident, thereby severely limiting Mr. Miller's opportunity for monetary relief from that claim. This Court found:

> [T]here remains a genuine dispute of material fact of whether Defendant Dr. Romeo Aranas was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment. The primary dispute of fact is whether Plaintiff was denied surgery because of the policies, or because it was not medically necessary or urgent. There are also disputes as to whether Plaintiff suffered further injury from delayed surgery and whether the NDOC has in effect a "one good eye" policy. (ECF 109, p.3)

Thus plaintiff Miller would need to prove at trial essentially three material facts: (1) NDOC does in fact have a "one good eye" policy; (2) Dr. Aranas denied Mr. Miller cataract surgery because of NDOC's "one good eye" policy; and (3) Mr. Miller suffered legally cognizable harm from the delayed surgery.

Review of the case record suggested that proving factual issue number 1 regarding NDOC's "one good eye" policy would be straightforward. The Ninth Circuit in *Colwell* had found that, as of year 2014, NDOC had in place a "one good eye" policy for several years. *Colwell,* 763 F.3d at 1069.

Concerning factual issue number 2, given *Colwell*'s findings, plaintiff Miller's counsel prepared to prove at trial that, by November 21, 2016 – two years after *Colwell* was decided – when he denied Mr. Miller's grievance, Medical Director Aranas personally reviewed MD 123.03's "one good eye" provision, which provided that to be considered for cataract surgery, inmates must have "a best corrected visual acuity of less than 20/60 in both eyes." Deciding the policy required no changes, Dr. Aranas adopted it as it stood. Dr. Aranas thus made clear his intent to adhere to NDOC's "one good eye" policy and ignore *Colwell's* mandate. As explained below, this evidence of Dr. Aranas's adherence to NDOC's "one good eye" policy and his deliberate indifference in responding to inmate Miller's request for cataract surgery is equally probative of plaintiff Miller's ADA Title II claim.

Additional evidence of Dr. Aranas's indifference to Mr. Miller's welfare lies in his formal admissions made in discovery that he knows of no treatment for cataracts other than surgery. Yet throughout this litigation, Dr. Aranas argued he was not deliberately indifferent because Mr. Miller saw

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                 5

doctors and seeing doctors meant Mr. Miller "received care." Plaintiff's counsel were prepared to expose Dr. Aranas's position as nonsensical. First, they had proof that Dr. Aranas never once consulted with any of Mr. Miller's treating eye specialists – or any medical providers – to learn their diagnoses and prognoses for his eye. Had Dr. Aranas reviewed Mr. Miller's medical records, as he claimed, he would have seen multiple referrals for surgery by eye specialists: Dr. Scott in 2002, who alerted NDOC to the impact of Mr. Miller's disability on his quality of life, Dr. Fischer who referred Mr. Miller out for strabismus evaluation in June 2016, and Dr. Seljestad, who in February and September 2016 specifically recommended "CEE" [cataract extraction evaluation] for Mr. Miller. Dr. Seljestad's recommendation for "CEE" was made two months before Dr. Aranas denied Mr. Miller's grievance seeking cataract surgery.

Had Dr. Aranas actually reviewed Mr. Miller's chart, he would have known the longevity of Mr. Miller's serious medical condition when denying him consideration for cataract surgery. It is the law of *Colwell* and here undisputed that monocular blindness is a serious medical condition. Mr. Miller's chart contains records documenting that he was blind in one eye since 1999. An inmate with such a long-term condition warranted serious consideration. Plaintiff's counsel were prepared to prove that Dr. Aranas did not give Mr. Miller's grievance serious consideration at all, but rather dismissed it with the stroke of his pen. Finally, Dr. Aranas admitted in discovery he never read *Colwell v. Bannister*, mandatory precedent that he was required to follow but ignored.

Concerning factual issue number 3, the matter of proving harm in this case demanded multiple interviews with Mr. Miller (while navigating prison rules) and substantial legal research. Mr. Miller's expectations regarding money damages from defendant Aranas were low due to the fact that his claim was based on a single encounter. So his counsel focused their efforts on his ADA claims and procuring other forms of relief. His paramount victory was in the equitable relief he obtained through his motions for preliminary injunction – a cataract surgery that restored much of his vision – and also through settlement, making NDOC amend its "one good eye" policy to conform to *Colwell*'s mandate.

### B.    Plaintiff's ADA Title II Reasonable Accommodation Claim Demanded Substantial Legal Research, Analysis, and Clarification

Being unsophisticated in the law, Mr. Miller had no idea that the ADA Title II offered a greater opportunity for relief because it enabled him to take on the NDOC directly and broaden his case to twenty years of rejections. The ADA quickly became the focus of the vast majority of his counsel's efforts. In

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                6

turn, Dr. Aranas's role as an agent and policymaker for NDOC was extremely probative of NDOC's pattern of failing to accommodate Mr. Miller's monocular blindness.

That said, there is much about Plaintiff Miller's ADA Title II claim that was challenging and counter intuitive. Anti-discrimination laws typically demand equal treatment of suspect classes. However, the ADA reasonable accommodation provisions demand unequal treatment of persons with disabilities. Equal treatment in an ADA reasonable accommodation claim meets the very definition of discrimination if individuals are excluded or screened out from a service, program, or activity by reason of their disability. This concept grows elusive in the context of causation, for example, where Dr. Aranas alleged that his rejection of Mr. Miller's grievance was for some reason other than NDOC's "one good eye" policy (which he personally signed off on).

The starting point for analysis is clear: The ADA is unique in its "affirmative duty…to provide special, preferred treatment, or 'reasonable accommodation'" for persons with disabilities. *McGary v. City of Portland,* 386 F.3d 1259, 1266 (9th Cir. 2004). The task of sorting through the caselaw to find reliable authority required substantial legal research, analysis and clarification on counsels' part. What may have been lost along the way is the fact that the crux of Mr. Miller's failure-to-accommodate claim centers upon NDOC staff's affirmative duty to provide special treatment in response to its awareness of Mr. Miller's disability and need for reasonable accommodation of NDOC's "one good eye" policy.

Under the ADA, eligibility requirements that exclude persons with a disability are by definition discriminatory. There is no question but that NDOC's "one good eye" policy screens out inmates, whether disabled by monocular blindness or not, from consideration for cataract surgery if they have one good eye. Therein lies the discrimination. Liability is established if, once aware of a disabled individual's request for modification of a discriminatory policy, the defendant fails to address availability of a reasonable accommodation. A failure to respond appropriately to a disabled individual's request for accommodation satisfies the "because of disability" causation standard. Causation lies in the "failure to accommodate."

In 2019, after Mr. Miller filed his ADA grievance seeking a reasonable accommodation of MD 123.03, NDOC's "one good eye policy," instead of considering his request, NDOC responded by citing the policy as justification for excluding him from consideration for cataract surgery. Thus the NDOC finally admitted what had been true all along, that its "one good eye" policy – condemned years earlier in

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                    7

*Colwell* – was the reason for Mr. Miller's exclusion from consideration for cataract surgery. (Exh. 4). Plaintiff's counsel were prepared, not only to prove Mr. Miller's ADA Title II claim at trial, but also to seek Judgment as a Matter of Law on this claim.

### 1. NDOC's "One Good Eye" Policy Constitutes Discrimination Under the ADA Because It Establishes an Eligibility Criterion That Excluded Mr. Miller

28 C.F.R. §35.130(b)(8) "General prohibitions against discrimination" states:

> A public entity shall not impose or apply *eligibility criteria* that screen out or tend to screen out an individual with a disability or any class of individuals with a disability from fully and equally enjoying any service, program or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered (emphasis added).

Accordingly, eligibility criteria that screen out persons with disabilities from fully enjoying services, programs, or activities available to nondisabled persons fall squarely within the ADA's definition of unlawful discrimination. "Facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced." *McGary,* 386 F.3d at 1265. A facially neutral *policy* that treats persons with disabilities in a manner different and worse than it treats nondisabled persons solely as a result of their disabling condition constitutes discrimination "by reason of disability." *Id.* NDOC's MD 123.03 – and its precursor as articulated in *Colwell* – is a facially neutral policy that did just that: It screened out Mr. Miller who had "one good eye" from consideration for cataract surgery while allowing nondisabled persons to enjoy these same medical services. This eligibility criterion imposed a greater burden on Mr. Miller different from and greater than for inmates with only mild vision loss in both eyes. A policy that sets a disproportionate burden on persons with disabilities because of their unique needs satisfies the "by reason of disability" test. *Id.*

### 2. NDOC Used Its "One Good Eye" Policy to Reject Mr. Miller for Cataract Surgery

There is no dispute that NDOC denied Mr. Miller's ADA grievance based on its "one good eye" policy when it rejected his request for accommodation. The *exact words* from MD 123.03 were used to deny Mr. Miller: "Inmate Miller: Your corrected visual acuity would need to be 20/60 in *both* eyes with current refraction in order to be considered for cataract surgery. Your corrected vision is 20/25, which does not qualify." (Exh. 4). That Mr. Miller was totally blind with no visual acuity in his right eye made him ineligible for consideration only because he could still see out of his left eye. At trial, plaintiff was prepared

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                    8

1    to prove that NDOC had notice of Mr. Miller's disability since 2002, when prison doctor John Scott, M.D.,

2    reported to NDOC that Mr. Miller's monocular blindness "significantly affected" his quality of life and

3    that he was a possible candidate for cataract surgery.

4        Because of his monocular blindness and lack of peripheral vision, Mr. Miller's life has been

5    significantly limited. Inability to see out of one eye is a hazard in the prison setting. Mr. Miller was prepared

6    to testify, over twenty years of NDOC's refusal to give him appropriate medical treatment for his eye, he

7    has been attacked by inmates coming at him from his blind right side; he has been injured by some of these

8    inmates (on one occasion losing hearing in his right ear for months). He has smacked into doors and

9    bumped into other inmates. He has been struck by balls seemingly coming out of nowhere. He has whacked

10   his head on low hanging shelves causing bleeding on multiple occasions. He has been unable to engage in

11   certain sports or obtain certain prison jobs due to his one-eyed blindness.

12   ### 3.    Causation Was Established With NDOC's Refusal to Accommodate Mr. Miller's Disability Given Availability of a Reasonable Accommodation.

13       Mr. Miller started submitting kites seeking cataract surgery in 2002. His goal in filing his 2019

14   "ADA" grievance was specifically to seek modification of the prison's "one good eye" policy, now

15   adopted in writing by Dr. Aranas as MD 123.03. (Exh. 3). The modification he sought was to create an

16   exception for persons like himself with monocular blindness. Without the modification, he and his fellow

17   inmates with one good eye would remain excluded as a matter of policy from this essential medical service.

18   The ADA defines a refusal to modify policy as discrimination:

19       Discrimination under the ADA includes a public entity's failure to "make
20       reasonable modifications in policies, practices or procedures when the
         modifications are necessary to avoid discrimination on the basis of disability,
21       unless the public entity can demonstrate that making the modifications would
         fundamentally alter the nature of the service, program or activity." 28 C.F.R. §
22       35.130(b)(7).

23   *Crowder v. Kitagawa,* 81 F.3d 1480, 1485 (9th Cir. 1996). Once on notice of the fact that one of its policies

24   excludes a disabled individual from engaging in a public entity's programs or services, to avoid liability, a

25   public entity ***must*** consider availability of a reasonable modification. NDOC should have done this several

26   years before.

27   ### 4.    The Reasonable Accommodation Mr. Miller Sought Was a Readily Available Exception to NDOC's Discriminatory "One Good Eye" Policy

28

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

The accommodation Mr. Miller sought is much like that sought by golfer Casey Martin in *PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001): an exception to a facially neutral policy that unduly burdened Mr. Martin based on his disability. The PGA Tour had established an "eligibility" requirement that golfers must walk the course. Mr. Martin qualified for the tournament in every respect except he could not walk the course and was thus excluded. The PGA Tour refused to modify its policy to allow Mr. Martin to participate. Mr. Martin successfully sued the PGA Tour by arguing exactly what Mr. Miller argued in his ADA claim: that the PGA Tour's refusal to modify its policy to create an exception based on his disability constituted discrimination in violation of the ADA. Just so, NDOC's refusal to modify its policy excluding Mr. Miller **based on his disability** constitutes unlawful ADA discrimination because a reasonable accommodation was available.

### 5. NDOC Was Deliberately Indifferent to Mr. Miller's Efforts to Seek a Reasonable Accommodation to Its "One Good Eye" Policy

For plaintiff Miller "[t]o recover monetary damages under Title II of the ADA…, [he] must prove intentional discrimination on the part of the defendant." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). Intentional discrimination is shown by deliberate indifference. As explained above, deliberate indifference is shown by Dr. Aranas's rejection of Mr. Miller's grievance seeking cataract surgery evaluation. For twenty years, NDOC refused to take seriously his several requests for cataract surgery despite its administrative regulations mandating that it do so. NDOC's response to Mr. Miller's 2019 grievance was the culmination of twenty years of rejections. NDOCs staff asked Mr. Miller no questions, engaged in no interactive process, and leaped to only one conclusion: that Mr. Miller required discipline and not a reasonable accommodation. Nevada AR 658, Reasonable Accommodation for Inmates with Disabilities, states: "All employees shall recognize and take **seriously any requests for disability accommodations**, and will engage in the "interactive process" with all inmates to assess whether the inmate has a disability. Yet Miller's experience made clear: Those fine words are illusory and bear no relation to what actually happened.

The settlement Mr. Miller achieved in resolution of his § 1983/ADA Title II claims compels NDOC to modify its policies and provisions to accommodate the needs of inmates disabled by monocular blindness for cataract surgery where medically appropriate and also includes $7,500 in general damages.

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs    10

1    Add this to the cataract surgery Mr. Miller earlier received as a consequence of Ms. Keyser-Cooper's

2    advocacy, this amounts to a huge win and vindication for Mr. Miller.

3    **C.    In his ADA Retaliation Claim, Plaintiff Sought and Obtained Removal of His Discipline for Protected Activity from his Record**

4    After filing his ADA reasonable accommodation grievance in 2019, Mr. Miller was immediately

5    disciplined by NDOC. (Exh. 5). Instead of engaging in the "interactive process" as required under the

6    ADA, NDOC disciplined Mr. Miller for filing his grievance. On March 1, 2021, this Court found that

7    Miller exercised protected activity when he filed his ADA grievance, he suffered an adverse action when

8    NDOC disciplined him, and a causal link existed between the two events thus establishing a prima facie

9    case. This Court also found that NDOC had established a legitimate nonretaliatory reason for its actions

10   and disputed issues of fact existed as to pretext. (ECF No. 109, pp. 10-11). Had the case not settled, Mr.

11   Miller would have proceeded to trial on the issue of pretext. Mr. Miller's requested relief for his retaliation

12   claim was the removal of the discipline from his record, which is precisely what he achieved through the

13   Settlement Agreement.

14   **IV.    PLAINTIFF ACHIEVED EXCELLENT SUCCESS ON ALL HIS CLAIMS**

15   Plaintiff Miller claims success on his ADA Title II/§ 1983 claims through the Settlement

16   Agreement, which states:

17   > NDOC acknowledges and agrees that its internal policies and procedures for
18   > dealing with inmates with monocular blindness shall conform to the requirements
19   > of *Colwell v. Bannister,* 763 F.3d 1060 (9th Cir. 2014). Specifically, NDOC
20   > acknowledges and agrees that neither it nor any employee acting on its behalf will
     > exclude inmates with monocular blindness from consideration for corrective
     > surgery based solely on a policy requiring an inmate to endure reversible blindness
     > in one eye if he can still see out of the other. NDOC remains free to deny corrective
21   > surgery for other reasons, however, including but not limited to: 1) a surgery not
22   > being medically indicated; 2) the condition being misdiagnosed; 3) a surgery would
     > not help; or 4) there exists a genuine difference of opinion between a physician and
     > the prisoner – or between medical professions – concerning what medical care is
23   > appropriate. See *Colwell,* at 763 F.3d at 1069. (Exh. 2: Settlement Agreement, p.
24   > 3).

25   In addition, Mr. Miller was awarded $7,500 in settlement of his twenty years' failed efforts to obtain

26   cataract surgery. Henceforth, NDOC will abandon its "one good eye" policy and no longer summarily

27

28

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                11

exclude monocular blind inmates like Miller from consideration for cataract surgery but instead will apply the *Colwell* holding to their cases. Gaining this equitable relief is a remarkable success for Mr. Miller.

Also, as part of the success with these claims, after Ms. Keyser-Cooper appeared in the case, in June 2020 Mr. Miller underwent cataract surgery. Having vigorously opposed Ms. Keyser-Cooper's motion for preliminary injunction, defendant NDOC changed course at the hearing on the matter and agreed to have an ophthalmologist evaluate Mr. Miller for surgery and proceed with the surgery if recommended. Mr. Miller initially felt the surgery unsuccessful because he could not "see" as he had hoped. He cannot read out of his right eye nor can he recognize the large "E" on a standard eye chart. But the surgery was definitely a success. Whereas before his surgery, Mr. Miller could see only light and dark, with large objects appearing like indistinguishable blobs, he now sees colors, shapes, light and dark and can recognize objects and identify people (if they are not standing too far away). He can see movement in ways he could not before. While he still lacks depth perception, he is much more capable of discerning if a person or object is coming towards him and is better able to avoid dangerous encounters with other inmates or flying balls. While Mr. Miller is disappointed he cannot yet read, he is grateful for the significant improvement—seeing colors, shapes, being able to identify objects and recognize people is a huge overall improvement. The cataract surgery Mr. Miller received and the improvement he experienced are strong credit to Ms. Keyser-Cooper's advocacy.

Regarding Mr. Miller's ADA retaliation claim, he achieved total vindication here too. The Settlement Agreement states:

> Within thirty (30) days of the filing of a stipulation to dismiss the Litigation, NDOC will cause the discipline imposed upon Plaintiff which is the subject of his retaliation claim to be retracted, rescinded, stricken from Plaintiff's prison record, and sealed or otherwise deleted so that said discipline can never be disclosed or argued to the Pardon's Board. (Exh. 2, p. 3).

Thus Mr. Miller achieved complete success on his retaliation claim – exactly the relief he sought – as no damages are available in ADA retaliation cases. The Ninth Circuit has held that "ADA retaliation claims are redressable only by equitable relief, [and] no jury trial is available." *Alvarado v. Cajun Operating Co.,* 588 F.3d 1261, 1270 (9th Cir. 2009). Now NDOC is required to do what was not otherwise required to do: remove Mr. Miller's discipline and see that it is retracted, rescinded, and stricken from his prison record, sealed, and deleted so that it can never be disclosed or argued to the Pardon's Board. Given how ADA

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                                    12

retaliation damages are nonexistent, Congress specifically provided statutory attorneys' fees as an incentive to encourage attorneys to handle these important cases. Disabled individuals may sue only for equitable relief but their attorneys may be fully compensated for their efforts.

## V.   PLAINTIFF'S COUNSEL ARE FULLY ENTITLED TO THEIR "REASONABLE AND VERIFIABLE" FEE

### A.   Plaintiff Is the Prevailing Party, Entitling His Attorneys to Their Reasonable Fee and Reimbursement of Costs

In the attached Settlement Agreement, the parties also specifically agreed that the Court was to retain jurisdiction to determine the amount of attorneys' fees and costs:

> The NDOC and Plaintiff agree that payment of $7,500 to Plaintiff provided herein is exclusive of reasonable and verifiable costs and attorneys' fees, with said costs and fees to be determined by the Court upon motion by Plaintiff." (Exh. 2, p. 3).

There is no question but that Mr. Miller's counsel are entitled to their reasonable fee. By obtaining a legally enforceable Settlement Agreement – which explicitly provides for reasonable attorneys' fees – plaintiff is the prevailing party, giving rise to his attorneys' entitlement to fair compensation for their efforts. In *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Res.,* 532 U.S. 598 (2001), the Supreme Court clarified the question of what it takes to be a prevailing party for the purpose of awarding attorney's fees. Under *Buckhannon,* a litigant must meet two criteria to qualify as a prevailing party: "First, he must achieve a 'material alteration of the legal relationship of the parties.' Second, that alteration must be 'judicially sanctioned.'" *Id.* at 604-05; see also *Labotest, Inc. v. Bonta,* 297 F.3d 892, 895 (9th Cir. 2002).

In *Barrios v. California Interscholastic Federation,* 277 F.3d 1128 (9th Cir. 2002), the Ninth Circuit held that "[u]nder applicable Ninth Circuit law, a plaintiff `prevails' when he or she enters into a legally enforceable settlement agreement against the defendant:"

> "[A] plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff…. [A] material alteration of the legal relationship occurs [when] the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant."

*Id.* at 1134 (citation omitted). In *Richard S. v. Department of Developmental Services,* 317 F.3d 1080 (9th Cir. 2003), the Ninth Circuit further clarified that a settlement agreement materially alters the legal

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs          13

relationship between the parties, because the defendants are required to do something directly benefitting the plaintiff that the defendant otherwise would not have to do. *Id.* at 1087.

Just as in *Barrios* and *Richard S.,* plaintiff Miller's Settlement Agreement has materially altered the legal relationship between the parties because NDOC is now required to do something directly benefitting Mr. Miller that it would otherwise not have to do. NDOC must now modify its policies and provisions concerning inmates with monocular blindness to conform with the holding of *Colwell.* Additionally, NDOC must now retract, rescind, and strike from Miller's prison record any reference to his discipline. Through Miller's legally enforceable Settlement Agreement and the district court's retention of jurisdiction to decide fees, Miller obtained a "'judicial imprimatur' that alters the legal relationship of the parties." *Id.* at 1088.

**B.    Plaintiff's Entitlement to Attorneys' Fees Is Not Limited by the Prison Litigation Reform Act (PLRA)**

As this Court is well aware, the PLRA provides that in prison actions in which attorneys' fees are authorized under § 1988, a cap of 150% typically applies. 42 U.S.C § 1997e(d). While there are multiple reasons the PLRA cap does not apply to attorneys' fees in this case, one stands above all: namely that defendants bargained away the PLRA cap when they entered the Settlement Agreement.

**1.    PLRA Fee Caps Do Not Apply Where Parties Settle Privately and Include Attorney Fee Provisions Outside the PLRA's 150% Cap**

Based on contractual terms reached in the parties' Settlement Agreement, the PLRA fee cap does not at all apply to Mr. Miller's case. The Settlement Agreement provides for "reasonable and verifiable attorneys' fees." It makes no mention of PLRA's fee limits. Courts have found that, in cases (such as this) where parties settle a lawsuit privately, they are free to include awards of attorneys' fees that would otherwise violate the PLRA's 150% cap. *Torres v. Walker*, 356 F.3d 238, 245 (2nd Cir. 2004). Where the settlement agreement does not reference the PLRA cap in its attorneys' fees provision, the attorneys are entitled to their full fee. *LaPlante v. Pepe*, 307 F. Supp. 2d 219, 223-25 (D. Mass. 2004). Thus the terms of the Settlement Agreement rule: There is no PLRA cap on fees.

**2.    PLRA Fee Caps Do Not Apply to Prison ADA Claims**

Even in the absence of a settlement agreement fee provision, in *Armstrong v. Davis,* 318 F.3d 965, 973-75 (9th Cir. 2003), the Ninth Circuit held: "The PLRA cap on attorney's fees does not apply to fees

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                    14

awarded under the ADA or the RA." The court further found that the district court did not abuse its discretion when awarding plaintiff's lawyers their full fee on "the tertiary § 1983 claim" as the arguments, discovery and witnesses supporting it so overlapped with the ADA and RA claims as to make discrete time allocation and billing challenging. Given their success on the ADA Title II and ADA retaliation claims as well as the substantial overlap of the ADA Title II and § 1983 claims, plaintiff's attorneys have a second independent justification for seeking their full fee unencumbered by the PLRA.

### 3. PLRA Fee Caps Do Not Apply to Prison § 1983 Cases with Equitable Relief

In another case not involving a settlement agreement, *Dannenberg v. Valadez*, 338 F.3d 1070, 1075 (9th Cir. 2003), the Ninth Circuit held that the PLRA cap on fees does not apply when an inmate obtains injunctive relief in addition to monetary damages in a § 1983 suit absent a showing that a specific portion of the attorneys' fees was incurred solely for the purpose of obtaining monetary relief. Here, plaintiff Miller obtained substantial non-monetary relief associated in part with his § 1983 claim, compelling NDOC to modify its policies and provisions to conform to the requirements of *Colwell*, requirements it felt free to ignore before. In addition he obtained monetary damages as compensation for his twenty-year wait for medical treatment in the form of cataract surgery resulting from NDOC's long failure to accommodate his disability.

### C. Awarding Substantial Attorney's Fees Meets the Fundamental Objective of Encouraging Meritorious Civil Rights/ADA Cases

Because successful ADA and § 1983 plaintiffs confer a benefit upon the public at large, Congress has authorized that the prevailing party be awarded attorneys' fees "to encourage attorneys to handle these important cases. "Such a policy ensures an incentive for impecunious plaintiffs who can ill afford to litigate their claims against defendants with more resources." *Bruce v. City of Gainesville, Ga*., 177 F.3d 949, 952 (11th Cir. 1999). "Congress intended "that the amount of fees awarded must be governed by the same standards which prevail in other types of equally complex federal litigation, not be reduced because the rights involved may be nonpecuniary in nature." *Jones v. Diamond,* 636 F.2d 1364, 1381-82 (5th Cir. 1981) (*en banc*).

To ensure that there are attorneys willing to perform the important function of securing the rights of disabled persons to "full participation in the social and economic life of the state" and to "full and equal access," the U.S. Congress found it necessary to provide substantial compensation for this work. *Blackwell*

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                    15

*v. Foley*, 724 F. Supp. 2d 1068, 1075 (N.D. Cal. 2010); see also *Walker and Adams v. Carnival Cruise Lines, Inc.,* 63 F. Supp. 2d 1083 (N.D. Cal. 1999). "Encouraging competent attorneys to handle ADA cases is necessary for effective enforcement." *Blackwell*, 724 F. Supp. 2d at 1075. Courts have found that "[d]espite efforts made over the last 30 [now 40] years to encourage attorneys to handle California law disability rights cases which seek public interest injunctive relief (and, since 1990, ADA cases), relatively few competent private attorneys have been willing to do so." *Blackwell*, 724 F. Supp. 2d at 1076.

"The fundamental objective" of attorneys' fee statutes is "to encourage suits effectuating a strong [public] policy by awarding substantial attorney's fees…to those who successfully bring such suits…." *Woodland Hills Residents Ass'n, Inc. v. City Council,* 23 Cal. 3d 917, 933 (1979). "To accomplish this, the award must be large enough 'to entice competent counsel to undertake difficult public interest cases." S*an Bernardino Valley Audubon Society, Inc. v. County of San Bernardino*, 155 Cal. App. 3d 738, 755 (1984).

> The Doctrine rests upon a recognition that privately initiated lawsuits are often essential to the effectuation of fundamental public policies…and that, without some mechanism authorizing the award of attorney's fees, private actions to enforce such important public policies would as a practical matter frequently be infeasible.

*Woodland Hills*, 23 Cal. 3d at 933.

This was a most difficult case because of the strong resistance plaintiff Miller encountered throughout several years of litigation. Before, NDOC rejected *Colwell*'s mandate and formally adopted MD 123.03, setting in stone its "one good eye" policy. As a result of Ms. Keyser-Cooper's advocacy, Mr. Miller obtained the cataract surgery he had been seeking for twenty years. Now, via the Settlement Agreement, NDOC has agreed to abide by *Colwell*. No longer will inmates blind in one eye be refused consideration for cataract surgery. Also before, NDOC refused to erase from Mr. Miller's record the discipline he had received for engaging in protected activity, marring his chance at gaining a pardon before he dies. Now NDOC has agreed to erase that discipline, allowing him hope of eventual freedom. The $7,500 in damages, while welcome, was the lesser part of Mr. Miller's case. The equitable relief achieved by his counsel transformed his case into a resounding success!

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                    16

1

## VI.    APPLICATION OF THE KERR FACTORS JUSTIFIES THE FULL ATTORNEYS' FEES REQUESTED

"Ordinarily, the trial court's starting point in fee-shifting cases is to calculate a lodestar; that is, to determine the base amount of the fee to which the prevailing party is entitled by multiplying the number of hours productively expended by counsel times a reasonable hourly rate." *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983). A court assessing attorneys' fees begins with a touchstone or lodestar figure, based on the "careful compilation of the time spent and reasonable hourly compensation of each attorney…involved in the presentation of the case." *Id.* at 434-35. In *Kerr v. Screen Guild Extras, Inc.,* 526 F.2d 67, 69-70 (9th Cir. 1975), the Ninth Circuit established factors for the court to consider when awarding attorneys' fees: (1) the time and labor required; (2) the novelty and the difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; (12) awards in similar cases.

### A.  The Time and Labor Required

In *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008), the Ninth Circuit held that the best judges of the amount of work necessary to win a civil rights case are the lawyers who won it. It found: "By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case." *Ibid.*  Civil rights and ADA work is risky, the outcome uncertain, and the necessity of waiting several years for a financial return is almost always required. This is especially true when litigating prisoner claims against their jailors. The Ninth Circuit recognized that no reasonable civil rights lawyer is going to spend more time on such a case than is necessary:

> It must also be kept in mind that lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee. It would be the highly atypical civil rights case where plaintiff's lawyer engages in churning. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker.

*Ibid.*

Nothing could be truer. Attorneys Keyser-Cooper, Wetherall, and Vaillancourt are highly experienced civil rights attorneys. They cannot afford to spend more time on these cases than is reasonably necessary because of the very high risk they will never be paid. Mr. Miller is an inmate with no ability to pay his legal bills. The last thing these lawyers had in mind was "churning" the case to build up extra fees because the risk of loss was too high. Rather than extend the case to trial, they jumped at settlement within moments of defendants agreeing to provide equitable relief in addition to monetary damages.

### B. The Novelty and the Difficulty of the Questions Involved

The difficulty in obtaining Mr. Miller's sought equitable relief was exacerbated by the defendants' "scorched earth" responses. While there is abundant caselaw for inmate § 1983 cases, there are few published ADA Title II reasonable accommodation cases, especially in the convoluted context of medical treatment. The law in this area is evolving and difficult. The crux of an ADA failure-to-accommodate claim centers upon a public entity's affirmative duty to provide special treatment in response to an individual's notice of a disability and request for reasonable accommodation. As explained before, this requirement of "special treatment" is counter-intuitive and a source of confusion in the courts. Reading the tea leaves in the caselaw was a challenge. There are no pattern jury instructions for ADA Title II claims to guide the analysis. Plaintiff's counsel had to invent jury instructions for this claim. The issue was further complicated by the PLRA, its grievance and damages provisions, which do apply in the prison ADA context, while its fee cap does not. Sorting out these intricacies took all the experience and skill Mr. Miller's counsel brought to bear.

### C. The Undesirability of the Case

This case was particularly undesirable in the Reno community. This community has very few civil rights lawyers because most civil rights plaintiffs are under stress, disadvantaged and cannot pay a lawyer's fee, or even the costs of litigation. Even fewer lawyers are willing to take on inmate cases. Sadly, meritorious inmate cases have little chance when no lawyers step up. When that happens, society loses.

> Congress and the courts have long recognized that creating broad compliance with our civil rights laws, a policy of the "highest priority," requires that private individuals bring their civil rights grievances to court. See *Newman v. Piggie Park Enterprises,* Inc., 390 U.S. 400, 402 (1968). Even when unsuccessful, such suits provide an important outlet for resolving grievances in an orderly manner and achieving nonviolent resolutions of highly controversial, and often inflammatory, disputes. Guaranteeing individuals an opportunity to be heard in court instead of

leaving them only with self-help as the means of remedying perceived injustices creates respect for law and ameliorates the injury that individuals feel when they believe they have been wronged because society views them as inferior. Our system of awarding attorney's fees in civil rights cases is in large part dedicated "to encouraging individuals injured by…discrimination to seek judicial relief."

*Harris v. Maricopa County Superior Court*, 631 F.3d 963, 971 (9th Cir. 2011). Ms. Keyser-Cooper has sat for years on this Court's "*pro bono* committee." The purpose of this committee is to find ways to encourage voluntary lawyers to take inmate cases. There is a dearth of such lawyers because of the difficulty and undesirability of representing inmates. Communicating with the inmate client is challenging and time-consuming. Arranging to talk to the client on a private line entails numerous calls to the warden's office. When the client needs to call the lawyer with something to say about the case, communications are necessarily guarded because the prison records all outgoing calls. Mr. Miller's case was especially undesirable because his crime was the murder of two people, including his wife – a set of facts likely to elicit strong and potentially hostile emotions from a jury. Finally, the PLRA's cap on attorneys' fees is a powerful disincentive. Working with the Court's *pro bono* committee, Washoe Legal Services posts pre-screened inmate cases on its website begging lawyers to take them on. No lawyer wants them.

Reno attorney Luke Busby, recognized for his representation of exoneree Cathy Woods, who spent 35 years in prison for a crime she did not commit, attests to the difficulty of these cases:

> Civil rights cases are particularly difficult to attorneys to manage because the opponent in such cases (the State) can essentially starve out an attorney representing a civil rights plaintiff, who invariably has vastly lesser resources available to litigate a case. Further, civil rights cases are substantively difficult to litigate, with doctrines like Qualified Immunity placing a high barrier to claims. Civil rights cases typically take much more time to litigate than normal civil cases because of the complexity of the field and the high stakes nature of the litigation. Thus, accepting the responsibility to take on a civil rights case places a heavy burden on attorneys both emotionally and financially, and usually represents a potentially decade long commitment to a client and a cause. This extraordinary burden and commitment should be adequately weighed and considered when determining the amount of fees to be awarded in such cases. (Exh. 6, ¶4).

Reno attorney Mark Mausert explains why he no longer practices civil rights law:

> I transitioned from 1983 work to sexual and racial harassment cases because of how difficult and unprofitable 1983 work tends to be. There are a number of handicaps which frequently attend the prosecution of a 1983 action. Often the plaintiff has an unsavory past, i.e., a number of criminal convictions…. Sometimes the underlying facts cast the plaintiff in a very unfavorable light…. Often the defendant is a law enforcement officer and law-abiding citizens tend to have a

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                 19

marked tendency to resist believing some law enforcement officers may disregard their oaths…. Coming to terms with such a realization is unpleasant and unsettling, i.e., suddenly a juror's world is perceived as a lot less safe. And, of course, jurors are usually aware tax dollars are at stake, i.e., the jurors (none of whom have usually been convicted of a felony), are asked to award their own tax dollars to a plaintiff. And, of course, the typical 1983 plaintiff is unable to pay a retainer and often cannot even contribute to funding the case, i.e., paying costs. (Exh. 7, ¶4).

Mr. Mausert further comments on the defense tactic of obstruction in civil rights cases:

The genesis usually lies in material part in the fact the defendant knows plaintiff's counsel is not being paid an hourly rate, i.e., is providing representation on a pure contingent fee basis, while trying to keep the law office door open and paying personal expenses, and most likely fronting costs. The motive is to starve the plaintiff's attorney and thereby create an appetite for a cheap settlement, or even an outright dismissal. (Exh. 7, ¶4).

Don Cook, a California civil rights lawyer, also addresses the challenges of bringing civil rights cases:

Police and government misconduct cases are among the most difficult and challenging cases for victims and their counsel to successfully prosecute. I know this from over 40 years of working on police and government misconduct cases, trying many and settling many more. Jurors tend to have inherent biases against believing that some law enforcement officers, whose job is to protect the public from crime, are not credible. There are, of course, exceptions…. But generally, because of the difficulty in prevailing in these cases most personal injury litigators avoid them. (Exh. 8, ¶8).

### D. The Amount Involved and the Results Obtained

As explained above, Mr. Miller obtained via his Settlement Agreement all the equitable relief he sought since the inception of this litigation plus $7,500.00 in damages, plus of course his attorneys' reasonable fees and costs. The amount of damages recovered cannot serve to limit his attorneys' entitlement to full and fair compensation for their labor. This is especially true in cases seeking equitable relief because the primary purpose of a lawsuit to enforce ADA Title II and ADA retaliation provisions is to obtain injunctive/equitable relief. In fact, it is the only available remedy under the ADA's retaliation provision. While attorney fees are alternatively available for obtaining plaintiffs damages, there is no requirement of any "relationship" between the amount of damages and the attorney fees necessarily expended to obtain the injunctive relief. See *Barrios,* 277 F.3d at 1135 (rejecting the defendants' argument that a recovery of $10,000 in damages was too low to justify an award of full attorneys' fees). Where fees are limited by the amount of damages, no matter how meritorious the claims, attorneys simply refuse to take the case. Moreover, courts have recognized that limiting fee awards by the amount of damages

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                    20

recovered is especially inappropriate where the amount of fees was driven up by the defendants' resistance to the lawsuit. *Lipsett v. Blanco,* 975 F.2d 934, 939 (1st Cir. 1992).

### E.  The Customary Fee

Under the lodestar method, the district court "multiples the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Gonzalez v. City of Maywood,* 729 F.3d 1196, 1202 (9th Cir. 2013). "'Reasonable rates' under § 1988 are to be calculated according to the prevailing market rates in the relevant legal community." *Blum v. Stenson*, 465 U.S. 886, 895 & n.11 (1984). "Generally, the relevant community is the forum in which the district court sits." *Barjon v. Dalton*, 132 F. 3d 496, 500 (9th Cir. 1997); see also *Carson v. Billings Police Depart*., 470 F.3d 889, 891 (9th Cir. 2005). Case law in the Ninth Circuit has further clarified that "such rates should be established with reference to the fees that private attorneys of an ability and reputation comparable to that of prevailing counsel charge their paying clients for legal work of similar complexity." *Common Cause v. Jones,* 235 F. Supp. 2d 1076, 1081 (C.D. Cal. 2002). Here, the relevant legal community is Reno, Nevada where the court hearing this matter sits.

Yet no one in the relevant legal community accepts inmate cases. Ms. Keyser-Cooper resides in Lake Havasu City, Arizona; Ms. Vaillancourt resides in Santa Cruz, California; and Mr. Wetherall resides in Las Vegas, Nevada. This Court is well aware of the paucity of lawyers willing to take on inmate cases. Accordingly, the Court should consider that, had Ms. Keyser-Cooper and her colleagues not taken on Mr. Miller's plainly meritorious case, he would not have had a chance.

#### 1.  Terri Keyser-Cooper (Exh. 10: Declaration)

Terri Keyser-Cooper is requesting $550 per hour. She was awarded $400 per hour in the case of *Doud v. Yellow Cab*, 3:13-cv-00664 (See ECF No. 94, p. 9, May 18, 2015). Ms. Keyser-Cooper recently resolved a disputed attorney's fees issue in *Clopp v. City of Sparks*, 3:30-00465, at $550 per hour.[2] Her Declaration under penalty of perjury describes a partial list of statutes withdrawn, ordinances recalled, and police procedures reformed directly due to her civil rights accomplishments. Ms. Keyser-Cooper has more than 36 years' experience, almost exclusively in civil rights litigation, handling more than 600 civil rights

---

[2] The attorney representing the City of Sparks, Craig R. Anderson, has confirmed that the settlement of fees in a disputed discovery matter in the amount of $80,000 was based on the hourly rate of $550 an hour. (Exh. 9).

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                    21

matters. On information and belief, Ms. Keyser-Cooper has litigated far more civil rights cases than any other lawyer in Northern Nevada. She has changed the law in approximately 20 cases, has 13 published opinions to her credit at both the district court and the Ninth Circuit levels, and has won 11 preliminary injunctions. She has been recognized by the NAACP and other civil rights advocates for her achievements in this area, has given many public presentations on civil rights matters and has been featured numerous times in local newspapers for her civil rights work. She is a member of the United States Supreme Court bar. She has also served as a federal mediator with the United States District Court, District of Nevada.

### 2.  Diane K. Vaillancourt (Exhibit 11: Declaration)

After graduating *magna cum laude* at the University of Wisconsin Law School, Diane Vaillancourt served as a judicial clerk in the Western District of Wisconsin. She is licensed to practice law before all the courts of California and Nevada, the Ninth Circuit Court of Appeals and the United States Supreme Court. She is a member of the National Police Accountability Project and Order of the Coif, and has been recognized by the ACLU for her work protecting homeless rights. For 24 of her 30-year law practice, her practice emphasis has been exclusively civil rights. She has successfully litigated hundreds of civil rights matters, achieving substantive changes in local laws as well as damages and vindication for individuals. She has argued several times before the Ninth Circuit generally with success, contributed to three briefs opposing Petitions for Certiorari before the U.S. Supreme Court, and obtained five favorable published opinions in the areas of jail suicide, police misconduct, prosecutorial immunity and the First Amendment. Her clients tend to be poor and disadvantaged, so her cases are typically handled on a contingent fee or pro bono basis. Of special relevance to this case, Ms. Vaillancourt has followed disability law since before the ADA was first passed in 1990 and has been recognized for her volunteer work advocating for individuals with disabilities. She has several disability rights cases to her credit. Ms. Vaillancourt seeks $550 per hour.

### 3.  Peter C. Wetherall (Exh. 12: Declaration)

Peter Wetherall has over 30 years of federal and state court litigation experience and has tried over 50 cases to a jury. He has also argued numerous appeals before the Nevada Supreme Court, the Ninth Circuit Court of Appeals, and is admitted to practice before the U.S. Supreme Court. While Mr. Wetherall's primary practice areas include pharmaceutical mass torts and serious injury cases, he has a breadth of experience in many other practice areas derived from a career spent helping people. His firm, the Wetherall

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                22

Group, Ltd., are AV Preeminent™ Peer Review Rated by Martindale-Hubbell®, which is the highest rating available. Mr. Wetherall is also a Certified "Personal Injury Specialist" by the Nevada State Bar. He has also been named a Top Lawyer, a Super-lawyer, a National Trial Lawyers Top 100, a Million-Dollar Advocate, a Multi-Million Dollar Advocate, and is a respected and published member of the Nevada Justice Association as well as numerous other Bar Associations. Mr. Wetherall seeks $750 per hour.

**F.    Whether the Fee Is Fixed Or Contingent**

This case was accepted on a contingent fee basis. "Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result." *Jones,, 636 F.2d at 1381.* The court in *Yates v. Mobile County Personnel Bd.,* 719 F.2d 1530, 1534 (11th Cir. 1983) held:

> Vindication of the policy of the law depends to a significant degree on the willingness of highly skilled attorneys...to accept employment in discrimination cases on a wholly contingent basis. They will hardly be willing to do so if their potential compensation is limited to the noncontingent employment. Busy and successful attorneys simply could not afford to accept contingent employment if those were the rules that were applied. The enforcement of our civil rights acts would then be entrusted largely to less capable and less successful lawyers who lack sufficient employment. Such an arrangement would ill serve policies of enormous national importance.

The court in *Chalmers v. City of Los Angeles,* 676 F. Supp. 1515, 1530 (C.D. Cal. 1987), discussed in detail the relevance of a fixed versus a contingent fee:

> [T]he lodestar figure alone does not differentiate between the case taken on a full retainer and a case in which an attorney spends many hours over a period of months or years with no assurance of any pay if the suit is unsuccessful. Even if the client ultimately prevails, the burden of supporting salaried employees and fixed costs during the course of the contingent litigation can be substantial.... To deny all considerations of the added burden and additional risks an attorney under a contingent fee agreement may have to bear does not strike us as "reasonable."

As this Court well knows, nothing could be riskier than handling inmate civil rights matters. Lawyers like Ms. Keyser-Cooper, Ms. Vaillancourt, and Mr. Wetherall, who accept such cases, must carefully evaluate potential clients, the validity of their claims, the likelihood of success, and be prepared to work several years with no compensation until the case is resolved. Yet they too have bills to pay.

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs                    23

### G.    Itemization of Time Records

Ms. Keyser-Cooper, Ms. Vaillancourt, and Mr. Wetherall have compiled separate time records, which are attached to their respective Declarations. Each attorney has divided their time into categories to demonstrate their precise efforts to the Court. Ms. Keyser-Cooper seeks $444,262.50 for 807.75 hours at $550/hour litigating this matter. (Exh. 10, ¶11). Ms. Vaillancourt seeks $98,560.00 for 179.2 hours at $550/hour. (Exh. 11, ¶16). Mr. Wetherall seeks $16,575.00 for 22.1 hours at $750/hour. (Exh 12, ¶14; Exh. 12-B). The total fees here requested are $559,397.50.

### H.    Miller's Necessary Costs Are Also Compensable

Mr. Miller has expended $429.90 in filing and funding this case. (Exh. 10, ¶13). Ms. Keyser-Cooper has expended $1,518.22. (Exh. 10, ¶12). These costs are compensable.

## VII.    CONCLUSION

Thus the total fees and costs here sought are $561,345.62. Full lodestar fees should be awarded in light of the importance of lawsuits such as this to enforce the rights of disabled inmates and to acknowledge the paucity of attorneys willing to take on these cases. Although available in these contingent fee cases, plaintiff declines any interest in a lodestar multiplier should the Court's deductions from this total be modest (i.e., less than 10% of the total).  However, should significant deductions be made to the award, plaintiff respectfully requests the Court to consider a reasonable multiplier.[3]

DATED: March 29, 2022            By:   /s/ *Diane K. Vaillancourt*

                                           TERRI KEYSER-COOPER
                                           DIANE K. VAILLANCOURT
                                           PETER C. WETHERALL
                                           *Attorneys for Plaintiff Miller*

---

[3] See *Kelly v. Wengler*, 822 F.3d 1085, 1093-94, 1102-05 (9th Cir. 2016) (PLRA case, affirming district court's multipliers of 2.0 and 1.3 because "prisoners in Idaho have such difficulty obtaining counsel for civil rights cases seeking declaratory and injunctive relief that Plaintiffs' counsel were likely the only attorneys willing to accept Plaintiffs' case.").

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs      24

1
2
3
4

**CERTIFICATE OF SERVICE**

5
6

I hereby certify that the foregoing MOTION FOR ATTORNEYS' FEES AND COSTS was

7

submitted electronically for filing and/or service with the United States District Court on <u>March 29,</u>

8

<u>2022</u>. Electronic service of the foregoing document shall be made in accordance with the CM/ECF-

9

Service List as follows:

10
11
12

Douglas R. Rands
Senior Deputy Attorney General
*Attorney for Defendants*

13
14

DATED: <u>March 29, 2022</u>         By:    <u>/s/ *Diane K. Vaillancourt*</u>

15

TERRI KEYSER-COOPER
DIANE K. VAILLANCOURT

16

*Co-Counsel for Plaintiff Miller*

17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICE OF
TERRI KEYSER-COOPER
2395 VIEJO PLACE
LAKE HAVASU CITY, AZ
775.337.0323

*Miller v. Aranas*: Plaintiff's Motion for Attorneys' Fees and Costs          25